No. 24-50879

# In the United States Court of Appeals for the Fifth Circuit

———

RICHARD LOWERY,

*Plaintiff-Appellant*,

v.

LILLIAN MILLS, in her official capacity as Dean of the McCombs School of Business at the University of Texas at Austin; ETHAN BURRIS, in his official capacity as Senior Associate Dean for Academic Affairs of the McCombs School of Business at the University of Texas-Austin; SHERIDAN TITMAN, in his official capacity as Finance Department Chair for the McCombs School of Business at the University of Texas-Austin; CLEMENS SIALM; JAY HARTZELL,

*Defendants-Appellees*.

———

Appeal from Orders of the United States District Court for the Western Dist. of Texas, The Hon. David A. Ezra (USDC No. 1:23-CV-129-DAE)

———

PLAINTIFF-APPELLANT'S OPENING BRIEF

———

Endel Kolde
Courtney Corbello
Nathan Ristuccia
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave, NW
Suite 801
Washington, DC 20036
202-301-3300
dkolde@ifs.org
ccorbello@ifs.org
nristuccia@ifs.org

Michael E. Lovins
LOVINS | TROSCLAIR PLLC
1301 S. Cap. Of Texas
Building A Suite 136
Austing, TX 78746
512-535-1649
michael@lovsinslaw.com

Counsel for Plaintiff-Appellant

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| PLAINTIFF-PETITIONER | COUNSEL FOR PETITIONER |
|---|---|
| Richard Lowery | Endel Kolde<br>Courtney Corbello<br>Nathan Ristuccia<br>INSTITUTE FOR FREE SPEECH<br>1150 Connecticut Ave., NW<br>Suite 801<br>Washington, D.C. 20036<br>dkolde@ifs.org<br>ccorbello@ifs.org<br>nristuccia@ifs.org<br><br>Michael E. Lovins<br>State Bar No. 24032555<br>LOVINS \| TROSCLAIR, PLLC<br>1301 S. Cap. Of Texas<br>Building A Suite 136<br>Austin, Texas 78746<br>Tel: 512.535.1649<br>michael@lovinslaw.com |
| DEFENDANTS-RESPONDENTS | COUNSEL FOR RESPONDENTS |
| Lillian Mills, in her official capacity as Dean of the McCombs | JACKSON WALKER LLP<br>Charles L. Babcock<br>cbabcock@jw.com |

| | |
|---|---|
| School of Business at the University of Texas at Austin; | Joel R. Glover<br>jglover@jw.com<br>Javier Gonzalez<br>jgonzalez@jw.com |
| Ethan Burris, in his official capacity as Senior Associate Dean for Academic Affairs of the McCombs School of Business at the University of Texas-Austin; | 1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>(713) 752-4200 – Phone |
| Sheridan Titman, in his official capacity as Finance Department Chair for the McCombs School of Business at the University of Texas-Austin; | Matt Dow<br>mdow@jw.com<br>Adam W. Aston<br>aaston@jw.com<br>Gabriela Barake<br>gbarake@jw.com |
| Clemens Sialm; in his official capacity as Finance Department Chair for the McCombs School of Business at the University of Texas-Austin (successor to Sheridan Titman); | Cody Vaughn<br>cvaughn@jw.com<br>100 Congress Ave., Suite 1100<br>Austin, Texas 78701<br>(512) 236-2056 – Phone |
| Jay Hartzell, in his official capacity as President of the University of Texas-Austin. | |
| OTHER INTERESTED PERSONS | COUNSEL |
| UNIVERSITY OF TEXAS AT AUSTIN<br>Office of the President<br>110 Inner Campus Drive<br>Stop G3400<br>Austin, TX 78712-3400<br>512-471-1232 (Phone) | Same as defense counsel above |
| Carlos Carvalho<br>(material witness)<br>Prof. of Statistics | Andrei Popovici<br>LAW OFFICE OF ANDREI D.<br>POPOVICI, P.C. |

| Director of the Salem Center McCombs School of Business University of Texas at Austin 2110 Speedway Stop B6500 Austin, TX 78712 | 1450 W Highway 290 #1200, Dripping Springs, TX 78620-9998 Tel: (650)530-9989 |
| --- | --- |

Respectfully submitted,

 *s/Endel Kolde*

Endel Kolde
*Attorney for Plaintiff-Appellant*

STATEMENT REGARDING ORAL ARGUMENT

Oral argument would aid the Court, because the case raises important questions regarding the First Amendment rights to academic freedom, to dissent from campus political orthodoxy, and to criticize public university officials, free from workplace retaliation; as well as important questions concerning the right to obtain typical discovery from a public institution.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................... iii

STATEMENT REGARDING ORAL ARGUMENT................................................vi

TABLE OF AUTHORITIES...............................................................................xi

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF ISSUES ....................................................................................2

STATEMENT OF THE CASE................................................................................3

      A.    Professor Lowery dissents from campus orthodoxy....................................................................3

      B.    The Liberty Institute controversy ...............................4

      C.    Lowery criticized discrimination and hypocrisy in college admissions...................................5

      D.    Lowery describes Hartzell as a dishonest front-man for leftwing faculty.................................5

      E.    Hartzell texts Dean Mills and Burris and the pressure campaign builds ..........................................6

      F.    On August 12 the deans ask Carvalho to counsel Lowery about his speech.................................8

      G.    Personnel associated with the Global Sustainability Leadership initiative agitate against Lowery...............................................................9

      H.    Lowery files suit........................................................11

      I.    The district court dismisses Lowery's retaliation claim but allows his chilled-speech claim to proceed under UT's *Keenan* standard ..........12

      J.    Lowery amends his complaint to add Hartzell as an official-capacity defendant and a separate unwritten-speech-code claim .....................................15

K.    The district court reverses itself on the *Keenan* test and dismisses Lowery's case ................................ 15

SUMMARY OF ARGUMENT .......................................................... 16

ARGUMENT ................................................................................. 18

I.    STANDARD OF REVIEW .......................................................... 18

II.    LOWERY STATED A VIABLE FIRST AMENDMENT RETALIATION CLAIM ......................................................................................... 18

    A.    Lowery spoke on matters of public importance .......... 19

    B.    *Breaux's* completed-employment-action standard is no longer good law ................................. 21

        1.    *Burlington Northern* implicitly overruled *Breaux* ................................................................ 21

        2.    Most circuits apply the *Burlington Northern* standard to public employees' First Amendment retaliation claims .......................... 25

        3.    Public employees' free speech rights deserve at least as much protection as statutory rights to non-discrimination ................................ 27

    C.    A reasonable employee would be dissuaded from speaking by the threat of lost pay and other benefits ............................................................ 28

III.    LOWERY STATED A VIABLE CHILLED-SPEECH CLAIM ........................ 30

    A.    Chilled-speech claims differ from retaliation claims ................................................................... 30

    B.    UT's officials admitted that their actions were designed to get Lowery to speak differently or not at all ................................................................ 32

    C.    The district court should have considered Lowery's judicial-estoppel and law-of-the-case arguments ............................................................... 34

        1.    The law-of-the case doctrine prevented UT from relitigating the *Keenan* standard .............. 35

2.     Judicial estoppel applies where UT urged the district court to adopt a standard and then reversed course ........................................... 37

IV.   LOWERY STATED A VIABLE PRE-ENFORCEMENT CLAIM TO UT'S UNWRITTEN SPEECH CODE .............................................................. 38

A.   UT has a history of trying to mandate "civility" on campus.................................................................. 38

B.   An unwritten speech code is both harder to challenge than a written speech code and more subjective................................................................ 40

C.   Lowery sufficiently alleged that Mills, Burris, and even Titman acted against him because they deemed some of his public commentary to be "uncivil," "offensive," "unmannerly," "factually inaccurate," or "rude" ................................ 41

D.   Lowery's unwritten speech code claim is like any other pre-enforcement challenge ......................... 44

V.   THIS COURT SHOULD RE-EXAMINE IN CAMERA SEVERAL WITHHELD DOCUMENTS ABOUT LOWERY ......................................... 46

A.   Hartzell's August 5 text messages to Mills and Burris about Lowery are presumptively unprivileged ............................................................... 47

1.     UT denied and delayed the disclosure that Jay Hartzell had texted Mills and Burris about Lowery in the summer of 2022 ................ 49

2.     Hartzell's texts were temporally proximate to the start of the pressure campaign against Lowery .................................................... 50

3.     A CEO's operational instructions are not privileged just because he includes a lawyer on the text thread................................................ 50

B.   Public relations talking points responding to Lowery's speech criticizing the university are not attorney-client privileged ..................................... 52

C.    The district court neglected to conduct its own in camera review of the disputed documents ............. 53

VI.  LOWERY SHOULD HAVE BEEN ALLOWED TO CONDUCT TARGETED DISCOVERY INTO THE HARTZELL NEPOTISM ALLEGATIONS BECAUSE UT CLAIMED LOWERY MADE INACCURATE STATEMENTS .... 54

A.    Lowery made credible allegations that President Hartzell used university resources to benefit his son in admission to a competitive graduate program at UT-Austin ................................. 54

B.    UT opened the door to the nepotism allegations because its officials characterized his opinions about Hartzell as "factually inaccurate" ................... 55

C.    The court's protective order did not meet Rule 26(c)(1)'s good-cause standard .................................... 57

CONCLUSION .......................................................................... 58

CERTIFICATE OF COMPLIANCE ................................................. 59

# TABLE OF AUTHORITIES

## Cases

*Albright v. Oliver,*
  510 U.S. 266 (1994)..................................................................28

*Alston v. Spiegel,*
  988 F.3d 564 (1st Cir. 2021) ...............................................25

*Arizona v. California,*
  460 U.S. 605 (1983)..................................................................35

*Bd. of Airport Comm'rs v. Jews for Jesus,*
  482 U.S. 569 (1987)..................................................................40

*Bevill v. Wheeler,*
  103 F.4th 363 (5th Cir. 2024) .............................................19

*Blessing v. Freestone,*
  520 U.S. 329 (1997)..................................................................27

*Blick v. Ann Arbor Pub. Sch. Dist.,*
  105 F.4th 868 (6th Cir. 2024) .............................................32

*BMC Software, Inc. v. IBM,*
  100 F.4th 573 (5th Cir. 2024) .............................................18

*Bonvillian Marine Serv. v. Pellegrin (In re Bonvillian Marine
  Serv.),*
  19 F.4th 787 (5th Cir. 2021) ...............................................24

*Brandon v. Sage Corp.,*
  808 F.3d 266 (5th Cir. 2015)...............................................28

*Breaux v. City of Garland,*
  205 F.3d 150 (5th Cir. 2000)..................................... passim

*Brooks v. Francis Howell Sch. Dist.*,
    599 F. Supp. 3d 795 (E.D. Mo. 2022)................................................44

*Burlington N. & Santa Fe Ry. v. White*,
    548 U.S. 53 (2006)........................................................ passim

*Burnside v. Kaelin*,
    773 F.3d 624 (5th Cir. 2014)............................................19

*Chemtech Royalty Assocs., L.P. v. United States*,
    No. 05-944-BAJ-DLD, 2010 U.S. Dist. LEXIS 150890 (M.D. La.
    Sep. 23, 2010)........................................................51

*Connick v. Myers*,
    461 U.S. 138 (1983)........................................................20

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005)................................................26

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013).............................................31

*Coszalter v. City of Salem*,
    320 F.3d 968 (9th Cir. 2003)............................................26

*Couch vs. Bd. of Trs. Of the Mem. Hosp.*,
    587 F.3d 1223 (10th Cir. 2009)...........................................26

*Cox v. Scott Cty. Sch. Dist.*,
    No. 3:18-CV-677-KHJ-LGI, 2021 U.S. Dist. LEXIS 251706 (S.D.
    Miss. Dec. 21, 2021) .....................................................23

*DePree v. Saunders*,
    588 F.3d 282 (5th Cir. 2009).............................................22

*Dodge v. Evergreen Sch. Dist. #114*,
    56 F.4th 767 (9th Cir. 2022) ...........................................28

*EEOC v. BDO USA, L.L.P.*,
    876 F.3d 690 (5th Cir. 2017)........................................18, 48

*Fennell v. Marion Indep. Sch. Dist.,*
  804 F.3d 398 (5th Cir. 2015)............................................................28

*Freedom from Religion Found., Inc. v. Abbott,*
  955 F.3d 417 (5th Cir. 2020)...........................................................40

*Gabarick v. Laurin Mar. (Am.) Inc.,*
  753 F.3d 550 (5th Cir. 2014)...........................................................37

*Gahagan v. United States Citizenship & Immigration Servs.,*
  911 F.3d 298 (5th Cir. 2018).....................................................24, 27

*Garrett Judson Indep. School Dist.,*
  299 Fed. Appx. 337, 346 (5th Cir. 2008).........................................23

*Gerlich v. Leath,*
  861 F.3d 697 (8th Cir. 2017)...........................................................44

*Gibson v. Kilpatrick,*
  734 F.3d 395 (5th Cir. 2013)...........................................................22

*Hall v. GE Plastic Pac. PTE, Ltd.,*
  327 F.3d 391 (5th Cir. 2003)...........................................................37

*Hamilton v. Dall. Cty.,*
  79 F.4th 494 (5th Cir. 2023) ...........................................................24

*Hous. Cmty. Coll. Sys. v. Wilson,*
  595 U.S. 468 (2022)........................................................................27

*Ictech-Bendeck v. Waste Connections Bayou, Inc.,*
  No. 18-7889, 2023 U.S. Dist. LEXIS 92390 (E.D. La. May 26,
  2023)...................................................................................48, 52

*In re Riddell Concussion Reduction Litig.,*
  No. 13-7585 (JBS/JS), 2016 U.S. Dist. LEXIS 168457 (D.N.J.
  Dec. 5, 2016).................................................................................48

*In re Vioxx Prods. Liab. Litig.,*
  501 F. Supp. 2d 789 (E.D. La. 2007)...............................48, 50, 51, 53

*Jackson v. Wright,*
82 F.4th 362 (5th Cir. 2023) ............................................................ 2

*Jackson v. Wright,*
Civil Action No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684
(E.D. Tex. Jan. 18, 2022) .................................................... 30, 31, 32

*Janus v. AFSCME, Council 31,*
585 U.S. 878 (2018) ........................................................................ 28

*Johnson v. Halstead,*
916 F.3d 410 (5th Cir. 2019) .......................................................... 22

*Keenan v. Tejeda,*
290 F.3d 252 (5th Cir. 2002) .................................................. passim

*Keyishian v. Bd. of Regents,*
385 U.S. 589 (1967) ........................................................................ 20

*Kubala v. Smith,*
984 F.3d 1132 (6th Cir. 2021) ........................................................ 29

*L.L.C. v. Magazine Invs. I L.L.C.,*
79 F.4th 487 (5th Cir. 2023) .......................................................... 35

*Lane v. Franks,*
573 U.S. 228 (2014) .................................................................. 19, 21

*Leone v. Caddo Par.,*
No. 19-309, 2022 U.S. Dist. LEXIS 25188 (W.D. La. Feb. 10,
2022) ............................................................................................... 23

*Levin v. Harleston,*
966 F.2d 85 (2d Cir. 1992) ............................................................. 31

*Loumar, Inc. v. Smith,*
698 F.2d 759 (5th Cir. 1983) .......................................................... 36

*Love v. Tyson Foods, Inc.,*
677 F.3d 258 (5th Cir. 2012) .......................................................... 37

*Maldonado v. Rodriguez,*
    932 F.3d 388 (5th Cir. 2019) ............................................................ 18

*Matrisciano v. Randle,*
    569 F.3d 723 (7th Cir. 2009) ............................................................ 26

*McNeill v. Tyson Fresh Meats, Inc.,*
    No. 2:23-CV-041-Z, 2023 U.S. Dist. LEXIS 219122 (N.D. Tex.
    Dec. 8, 2023) ............................................................................ 28

*Minn. Voters All. v. Mansky,*
    585 U.S. 1 (2018) ...................................................................... 40

*N.M. Top Organics-Ultra Health, Inc. v. Kennedy,*
    No. 17-CV-00599-JAP-LF, 2018 U.S. Dist. LEXIS 60361
    (D.N.M. Apr. 10, 2018) ................................................................ 44

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982) .................................................................... 21

*Nieves v. Bartlett,*
    587 U.S. 391 (2019) .................................................................... 18

*Ostrewich v. Tatum,*
    72 F.4th 94 (5th Cir. 2023) ...................................................... 40, 44

*OSU Student All. v. Ray,*
    699 F.3d 1053 (9th Cir. 2012) ........................................................ 41

*Pickering v. Bd. of Educ.,*
    391 U.S. 563 (1968) ................................................................ 21, 56

*Roark & Hardee LP v. City of Austin,*
    522 F.3d 533 (5th Cir. 2008) .......................................................... 41

*Sanchez v. Presidio Cty.,*
    No. P:19-CV-037-DC, 2021 U.S. Dist. LEXIS 118416 (W.D. Tex.
    June 20, 2021) .......................................................................... 23

*Slocum v. Int'l Paper Co.*,
549 F. Supp. 3d 519 (E.D. La. 2021)...................................... 48

*Snyder v. Phelps*,
562 U.S. 443 (2011) ................................................. 19, 28

*Spears v. McCraw*,
No. 20-50406, 2021 U.S. App. LEXIS 23231, (5th Cir. Aug. 5,
2021) ............................................................................ 22

*Specht v. City of New York*,
15 F.4th 594 (2d Cir. 2021) ....................................... 26

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) .......................... 39, 44, 45

*Suppan vs. Dadonna*,
203 F.3d 228 (3d Cir. 2000) ..................................... 27

*Taylor v. Root Ins. Co.*,
109 F.4th 806 (5th Cir. 2024) ................................... 18

*Tex. Entm't Ass'n v. Hegar*,
No. 1:17-CV-594-DAE, 2019 U.S. Dist. LEXIS 239481 (W.D.
Tex. Feb. 27, 2019)............................................... 36

Texas v. Yellen,
105 F.4th 755 (5th Cir. 2024) ................................... 44

*United States v. Bollinger Shipyards, Inc.*,
775 F.3d 255 (5th Cir. 2014) ................................... 41

*United States v. Bollinger Shipyards*, Inc.,
No. 12-920, 2015 U.S. Dist. LEXIS 48175 (E.D. La. Apr. 13,
2015)......................................................................... 53

*United States v. Castillo*,
179 F.3d 321 (5th Cir. 1999).................................... 35

*United States v. Nat'l Treasury Emples. Union,*
513 U.S. 454 (1995) ............................................................. 32

*Vulcan Materials Co. v. City of Tehuacana,*
238 F.3d 382 (5th Cir. 2001) ...................................... 29, 41

*Williamson v. St. Tammany Par. Fire Prot. Dist. No. 12*,
No. 18-1195, 2018 U.S. Dist. LEXIS 77102 (E.D. La. May 7,
2018) ................................................................................... 23

## Statutes

28 U.S.C. § 1291 ...................................................................... 2

28 U.S.C. § 1331 ...................................................................... 1

42 U.S.C. § 1983 ........................................................... passim

## Other Authorities

Keith E. Whittington, *You Can't Teach That! The Battle Over*
*University Classrooms* (2024) ........................................... 20

Merriam Webster, https://www.merriam-
webster.com/dictionary/hypocrisy (last visited January 23,
2025) .................................................................................. 55

The Sedona Conference, *Commentary on Protection of Privileged*
*ESI*, 17 SEDONA CONF. J. 95 (2016) ................................. 51

## Rules

Fed. R. App. P. 4(a)(1)(A) ...................................................... 2

Fed. R. Civ. P. 26(c)(1) ...................................................... x, 57

## Treatises

8 Charles Alan Wright, Arthur R. Miller, Richard L. Marcus,
*Federal Practice and Procedure* § 2026 (2d Ed. 2007) ....... 51

JURISDICTIONAL STATEMENT

(a) The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as the dispute arises under the United States Constitution and 42 U.S.C. § 1983.

(b) This appeal arises from the Judgment of the U.S. District Court for the Western District of Texas – Austin Division dated October 2, 2024 (ROA.3136-71), including:

i. The district court's order dated October 2, 2024 granting Defendants' motion to dismiss and for partial summary judgment, denying motion to defer ruling and denying the motion to dissolve the protective order; (ROA.3136-3170)

ii. The parts of the district court's order dated March 26, 2024 (Order Affirming Magistrate Judge's Orders) (ROA.2695-2704) overruling Plaintiff's objections to the magistrate's rulings on (1) UT's documents reviewed in camera and withheld under claims of privilege, and (2) granting a protective order to block all discovery into allegations that Jay Hartzell engaged in nepotism by using state resources to benefit his son in admission to UT; and

iii. The part of the district court's order dated September 5, 2023 (1) Granting in Part and Denying in Part Motion to Dismiss; and (2) Denying without Prejudice Motion for Preliminary

Injunction) (ROA.1307-1338) dismissing Plaintiff's First Amendment retaliation claim.

This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

(c) The final judgment encompassing these orders was entered October 2, 2024. ROA.3171. Plaintiff filed his notice of appeal from that judgment on October 30, 2024. ROA.3172-3173. The appeal is timely pursuant to Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES

1. Have subsequent Supreme Court and Fifth Circuit decisions overruled or cabined to its facts the standard for public-employee First Amendment retaliation claims described in *Breaux v. City of Garland*, 205 F.3d 150 (5th Cir. 2000)?

2. Did Plaintiff state a viable claim for free-speech chilling under *Jackson v. Wright*, 82 F.4th 362 (5th Cir. 2023) and other cases?

3. Did Defendants' choice to repeatedly argue that the standard in *Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002) applied to Plaintiff's free speech chilling claim, and the district court's decision to accept this standard, render this standard binding under the law-of-the-case doctrine and judicial estoppel?

4. Did the district court err when it withheld various UT documents, reviewed by the magistrate judge in camera, under claims of attorney-

client privilege, including text messages sent by UT President Jay Hartzell shortly before the pressure campaign against Lowery began?

5. Did the district court err when it granted a protective order to block all discovery into allegations that President Hartzell engaged in nepotism by using state resources to benefit his son in admission to UT?

## STATEMENT OF THE CASE

### A. Professor Lowery dissents from campus orthodoxy

Plaintiff Richard Lowery—a professor at UT's McCombs School of Business and Senior Scholar at McCombs' Salem Center for Policy—has a history of speaking, posting, and publishing on controversial topics such as DEI (diversity, equity, and inclusion), affirmative action, academic freedom, and capitalism. ROA.106-109, 2710-2711. Lowery dissents from the political and academic views held by most UT faculty and administrators, and he has publicly criticized UT President Jay Hartzell[1] and other university leaders for their support of DEI ideologies. *See* ROA.108, 2015-2016, 2710-2711. One of his recurring themes is that UT improperly uses taxpayer funds to promote left-wing political indoctrination and activism. *See* ROA.109, 121, 2710-2711, 2731. Lowery has made his positions known to university donors and to elected officials in Texas, including those who determine UT's funding.

---

[1] Hartzell recently announced that he is leaving UT later in 2025. Fed. R. Civ. P. 25(d) provides for automatic substitution of his successor since Lowery brings only official capacity claims.

ROA.106, 113-114, 1028-1029, 2710, 2715-2716. In addition to publishing his views in articles, Lowery has used alternative media— such as Twitter[2] and podcast appearances—to promote his views. ROA.112-114, 2715-2716.

### B. The Liberty Institute controversy

In 2021, Lowery and his friend Carlos Carvalho, Executive Director of the Salem Center, crafted a proposal for "The Liberty Institute"— an institute at UT-Austin dedicated to increasing intellectual diversity and promoting classical liberalism, including support for free markets, ideological neutrality, and ordered liberty. ROA.110, 124-125, 2712-2713. According to Lowery, Hartzell and other UT officials eventually hijacked the Liberty Institute project, redirected its funding, and established a watered-down "Civitas Institute," instead. ROA.111, 125, 2714, 2918-2920. In response, Lowery spoke and published articles criticizing Hartzell, other UT administrators, and the new Civitas Institute. ROA.111-112, 125, 2714-2715. Lowery's commentary did not go unnoticed by UT officials. In the summer of 2022, things came to a head.

---

[2] The social-media platform Twitter is now known as X, but many of the background events in this case occurred while it was still called Twitter, so we mostly use that term.

### C. Lowery criticized discrimination and hypocrisy in college admissions

On June 28, the *Washington Times* published an article by Lowery opposing affirmative action, which decried the hypocrisy of "self-interested administrators [who] find themselves in the interesting position of working hard to disadvantage in the admissions process people the same identity profile as their own children—though, of course, this disadvantage seldom reaches to their children themselves." ROA.140, 143, 2711-2712. When he wrote this, Lowery had Hartzell in mind, because Lowery has a credible basis to believe that Hartzell—who is white—and his deputy Nancy Brazzil tried to secure special treatment for Hartzell's son in his application for UT graduate-school admission. ROA.2014-2016.

### D. Lowery describes Hartzell as a dishonest front-man for leftwing faculty

In a podcast interview released on July 18, 2022, Lowery discussed the Liberty Institute's failure and opined that Jay Hartzell was good at lying to Republicans. ROA.112, 1717-1721, 1737, 2715, 2720, 2928. He also discussed the problem of "fake conservatives" in academia who he believes provide cover for the mostly leftwing faculty. ROA.1721:10-1722:14, 1726:24-1727:20.

Beginning in July and August 2022, UT officials threatened and pressured Lowery to keep him from publicly criticizing the university

and its leaders, including on Twitter. *See* ROA.115-116, 119, 2720. For example, Sheridan Titman—the chair of Lowery's department—testified that on July 19, the day after Lowery's podcast interview, Hartzell "grumble[d] [to Titman] about something that Richard said" and "mention[ed] that Richard was being a pain." ROA.2720, 2922:16-2925:24, 2929. Titman eventually told Lowery that Hartzell "was not happy with what [Lowery] had been saying" and had asked Titman "if something could be done about [Lowery's] public statements criticizing Hartzell." ROA.1026-1027, 2926:14-2927:5.

A week or two later after the Hartzell-Titman conversation, in late July, Titman told Carvalho on the phone that "Jay [Hartzell] and Lil [Defendant Dean Lillian Mills] want us to do something about Richard" because they "were upset about Lowery's political advocacy" and wanted Titman and Carvalho to "ask [Lowery] to tone it down." ROA.2722, 2945-2946. But Carvalho "refused to do anything" about Lowery, although he understood this statement to be "an implicit threat." ROA.125, 2722.

### E. Hartzell texts Dean Mills and Burris and the pressure campaign builds

On the morning of August 5, Jay Hartzell initiated a series of texts with Brazzil, Defendant Mills, Defendant Senior Associate Dean Ethan Burris, and Vice President for Legal Affairs Amanda Cochran-McCall about negative "media coverage of [the] new [Civitas] institute" that

6

Lowery had "induced." ROA.1458, 2662-2663, 2720-2721. UT officials initially denied under the penalty of perjury that Hartzell had communicated with Mills and Burris about Lowery around this time, but they eventually altered their previous deposition answers and disclosed the communications on a privilege log, without producing their contents. ROA.1141, 1147, 1425, 1432, 1436.

A few days after Hartzell texted Mills and Burris, on August 9, Jeff Graves, a high-level executive in Hartzell's office, forwarded Mills and Burris an anonymous complaint asking UT to investigate if Lowery's podcast interview violated UT's "standards of ethics and respect for faculty." ROA.1904-1905, 2719-2721. Graves stated that he sent the complaint to the two deans for their "review and handling" as a "personnel matter" about "whether Professor Richard Lowery crossed any lines regarding ethics or compliance" and that "Legal will provide advice." *Id.* Between August 9 and August 12, Mills repeatedly communicated with UT Legal, with Burris, and with Titman about Lowery. *See* ROA.2664, 2667-2668, 2832-2834, 2921, 2992-2995.

On August 12, UT's Assistant Vice President for University Communications Mike Rosen emailed a draft set of "talking points" about how to respond to "inquiries" from donors to Hartzell, Mills, and seven other UT officials, prompted by Lowery's speech. *See* ROA.1458, 2664, 2725-2726, 2833. UT listed these talking points on their privilege log, but did not produce them in discovery. ROA.1425-1426.

## F. On August 12 the deans ask Carvalho to counsel Lowery about his speech

Also on August 12—one week after Hartzell sent his texts and three days after Graves transmitted the anonymous complaint—Mills and Burris met with Carvalho with the "goal" of getting Carvalho to "counsel" Lowery so that Lowery would "stop making comments that are factually inaccurate and disruptive to operations" such as "asking people not to donate to UT" or opining that "the president is paid to be good at lying to conservative donors and politicians[.]" ROA.2722-2723, 2974-2977, 3001, 3008-3009.

During this meeting, Mills and Burris said that Lowery's criticisms were "crossing the line," and pointed out that Carvalho, as Executive Director of the Salem Center, had "the power to have [Lowery] not be attached to the center." ROA.125-126, 2114, 2722-2723, 2957-2958. Dean Mills also "stressed" that Salem's "directors served at the pleasure of the dean." ROA.2113, 2957, 2998-2999. Lowery's affiliation with the Salem Center is subject to annual approval and is separate from his status as a tenured faculty member. *See* ROA.126, 2713, 2724, 2825. Carvalho and Burris both have the power to terminate Lowery's position at the Salem Center, which would cost Lowery $20,000 in salary as well as prestige and research opportunities. ROA.107-108, 119, 126, 2729.

During the August 12 meeting, Mills highlighted statements from the July 18 podcast interview, an August 5 article, and various "public tweets" as examples of comments that Lowery should stop making. ROA.3015-3016. Carvalho understood this as a threat to end Lowery's affiliation with the Salem Center or even to remove Carvalho as Executive Director if he did not pressure Lowery into changing his speech. ROA.126-127, 2723, 2947-2952.

Twelve days later, at an August 26 follow-up meeting between Burris and Carvalho, Burris complained that Lowery's "uncivil rhetoric in communications" and the "uncivil tone of [his] tweets" were "damaging to the school" and harmful to "staff and other faculty who are not tenured." ROA.126, 2723-2724, 2978-2980, 3018. And at a third meeting, on or around October 17, Burris again threatened Lowery's Salem Center position, stating that, although Burris had just renewed Lowery's annual appointment, he might not renew it in the future because of Lowery's speech. ROA.126, 2724, 2959-2960. Carvalho refused to try to change Lowery's speech, but he relayed these conversations with Mills, Burris, and Titman to Lowery, as Defendants "requested and [] must have expected." ROA.115-116, 127, 2724.

G.    Personnel associated with the Global Sustainability Leadership initiative agitate against Lowery

On August 22—a few days before the second of the three Carvalho meetings—Lowery posted on his Twitter account a tweet criticizing an

9

event hosted by the school's Global Sustainability Leadership Institute (GSLI) for its lack of ideological balance. ROA.114-115, 2717-2718.[3] This tweet used an obscured obscenity for emphasis and mentioned the Bolsheviks' 1918 murder of the Romanovs—the deposed imperial house of Russia. ROA.172, 2719. Lowery's tweet pointed out the hypocrisy of people who condemn the Salem Center as too right-leaning (even though the Salem Center invites socialists to speak, including ones who praise the murder of the Romanov family) while never demanding leftwing campus groups seek ideological balance. ROA.1032-1033, 2961-2962.

But some UT faculty and administrators asserted that the tweet was rude, unacceptable, and even potentially dangerous, and arranged for UT police to open a "threat mitigation investigation" against Lowery. ROA.187, 2726-2729, 2930-2933, 3024. Although Mills was not directly involved with this police investigation, Mills found Lowery's tweet "offensive," worried that it could affect UT's "brand," and testified that their employees' referral of Lowery's tweets to the police was "appropriate" and not something that required corrective action. ROA.2987-2991.

---

[3] Lowery has criticized the GSLI for, among other things, promoting ESG and political activism in business enterprises. ROA.114-117, 2717-2719.

Similarly, Titman forwarded to Lowery an email from other UT faculty complaining about the tweet and told Lowery "You don't seem to be making friends" and that he should limit himself to "the appropriate response" of sponsoring academic panels, rather than tweeting, in the future. ROA.116, 184-186, 2727. According to Titman, this email with Lowery was part of Titman's duty as chair "to evaluate somebody . . . on my faculty" as Titman is "in charge of . . . making suggestions on what they are doing." ROA.2936-2937. Lowery understood Titman to be warning him to stop tweeting lest Mills or Burris cut Lowery's pay or otherwise discipline him. *See* ROA.116-117, 1027-1028.

Because of this pressure from UT administrators and faculty, Lowery began to self-censor in late August 2022, eventually stopping his tweets altogether and no longer writing or speaking in public on UT-specific issues. ROA.118-120, 1031-1032, 1807, 2727-2731. It was only after Lowery began self-censoring in late August that Burris renewed his Salem Center appointment, *see* ROA.2825, and that Lowery's annual pay raise was approved, *see* ROA.2853.

### H. Lowery files suit

Lowery brought this lawsuit in defense of his First Amendment rights on February 8, 2023, naming as official-capacity defendants: Lillian Mills (Business School Dean), Ethan Burris (Senior Associate Dean for Academic Affairs), and Sheridan Titman (Finance Dept.

Chair). ROA.4, 23. He filed a motion for preliminary injunction to prevent further chilling, and asked for early discovery, in part to determine whether President Hartzell had directed the effort to silence him. ROA.5, 78. The district court allowed Lowery only limited depositions on written questions (DWQ) directed at the defendants, ROA.1106, which Lowery used to ask these officials whether they had communicated with Hartzell about Lowery's speech between June 30 and September 1, 2022. ROA.1141, 1147. Defendants denied doing so. *Id*. Later discovery, however, would show otherwise. ROA.1425, 1432, 1436, 2922-2925.

> I.   The district court dismisses Lowery's retaliation claim but allows his chilled-speech claim to proceed under UT's *Keenan* standard

On September 5, 2023, the district court dismissed Lowery's employment retaliation claim, concluding that, under *Breaux v. City of Garland*, 205 F.3d 150 (5th Cir. 2000), an employer as a matter of law does not retaliate against free speech when that employer threatens to demote an employee, cut his pay, or otherwise adversely act against that employee if the employee does not stop speaking freely. ROA.44-46. 1328-1330. The district court, however, denied UT's Rule 12(b)(6) motion against Lowery's alternative claim (for chilled speech), finding that Plaintiff had sufficiently alleged viable claim under the standard in *Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002). ROA.42-44, 1331-1332.

While Lowery urged the court to conclude that chilled speech is a separate cause of action, it was Defendants—not Plaintiff—that argued to the district court that the *Keenan* standard applied to Lowery's chilled-speech claim, as the district court then held. *See, e.g.*, ROA.686, 3097, 3146-3148. UT later reversed course and argued that *Keenan* was the wrong standard, before reversing course again and citing it as the correct standard once more. ROA. 2751-2752, 3097, 3146-3148.

In the interim, the lawsuit entered regular discovery. On December 7, 2023, UT for the first time disclosed that Hartzell texted with Mills, Burris, and others, about Lowery on August 5, which contradicted their earlier DWQ answers, signed under penalty of perjury. ROA.1423, 1425, 1432-1433, 1436-1437. Titman also disclosed that he spoke with Hartzell about Lowery on July 19, contradicting his earlier DWQ answers. ROA.1152, 2922-2925.

The discovery process soon led to numerous conflicts and disputed motions. ROA.11-15. On February 14, 2024, Magistrate Judge Howell ruled on nine different motions, involving various disputes that arose between the parties during discovery. *See* ROA.2524-2528. After Plaintiff appealed some of these rulings, the district court affirmed all the magistrate judge's decisions. ROA.2695-2704. Two of those rulings are at issue before this Court.

First, the district court denied in part Plaintiff's motion to compel the production of several documents that UT withheld in their entirety, as

supposedly attorney-client privileged: Defendant Hartzell's August 5 text chain with Mills and others, and Mike Rosen's draft "talking points" for responding to donors and alumni concerned about Lowery's speech concerning the Business School's proposed land-acknowledgement on course syllabi and the accompanying email forwarding them to Hartzell, Mills, and others. ROA.2699-2700, 2724-2726, 2833. Lowery had argued that UT's own descriptions showed that these documents were mixed business and legal communications that should be turned over with any legal advice redacted. ROA.1389-1392, 1773-1775. Although Lowery asked the district court to review these documents in camera, *see* ROA.2616-2619, the district court affirmed the magistrate judge's decision without reviewing these documents independently, see ROA.2699-2700.

Second, the district judge affirmed the magistrate judge's decision to grant without prejudice UT's motion for a protective order preventing discovery into "allegations that UT President Jay Hartzell used state resources to advantage his son in admission to UT." ROA.2702-2703. While the Court left open the possibility of re-opening the issue if President Hartzell were added as a defendant, the magistrate judge indicated that it would not necessarily make that topic discoverable. ROA.2527.

J.  Lowery amends his complaint to add Hartzell as an official-capacity defendant and a separate unwritten-speech-code claim

On March 26, 2024, the district granted Lowery leave to amend his complaint, in order to add Hartzell as an official-capacity defendant, add a new unwritten-speech-code claim, and revise Lowery's pre-existing chilled-speech claim. *See* ROA.2692-2694. Lowery's Amended Complaint contained allegations about Hartzell's motives and hypocrisy, which did not appear in the original complaint. *See* ROA.2332-2334, 2342-2345, 2354-2359. As a result, Lowery moved to dissolve the protective order so that he could seek discovery into the nepotism allegations. ROA.3079-3092.

K.  The district court reverses itself on the *Keenan* test and dismisses Lowery's case

On October 2, 2024, the district court granted Defendants' motion to dismiss and their motion for partial summary judgment on Lowery's chilled-speech claim and speech-code claim. ROA.2731-2737, 3136-3170. The court held that Lowery had failed to allege or provide evidence of sufficient facts to establish these claims under *Breaux*, 205 F.3d, and that it had erred in previously holding that the standard in *Keenan*, 290 F.3d, applied. ROA.3146-3151, 3156-3157, 3167-3168. The district court also denied as moot Lowery's motion to dissolve the protective order. ROA.3169.

## SUMMARY OF ARGUMENT

Richard Lowery stated plausible claims for First Amendment retaliation, chilled speech and a pre-enforcement challenge to UT's unwritten speech code. It is undisputed that Lowery commented on matters of public importance in a way that offended UT administrators, who directed Carlos Carvalho to "counsel" Lowery about his speech so it would change or stop. They also threatened Lowery's Salem Center position and $20,000 annual stipend, causing Lowery to begin self-censoring. Only after he stopped commenting was his stipend renewed.

*First,* these threats were sufficiently adverse to silence a reasonable public employee, and this Court should recognize that the *Breaux* standard is no longer good law. *Second,* Lowery's distinct chilled-speech claim is viable under the *Keenan* test, which UT first proposed and the district court initially adopted, before later rejecting it. Both the law-of-the-case doctrine and judicial estoppel should have caused the district court to stay the course. In the alternative, this Court should recognize that where university administrators take deliberate action to silence a public employee's speech on matters of public importance, and admit to doing so, they create a viable chilled-speech claim, even if their misconduct does not amount to a completed adverse employment action.

*Third,* UT has an established history of trying to mandate "civil" speech on campus. Its efforts to do so with written policies having failed due to litigation, it may not now apply an unwritten policy or practice

against Lowery for making public comments that some people deem "offensive," "lacking in civility," "unmannerly," or "factually inaccurate," just because they dislike his viewpoints. Lowery has shown that faculty with leftwing views are able to post commentary about campus and public affairs using provocative language without facing counseling or other scrutiny from the UT administration. UT's unwritten speech code is inherently vague and subjective. As a result, he has articulated a viable pre-enforcement challenge to that speech code, even if UT had only threatened, but not yet punished him under it.

Finally, Lowery requests that this Court have a second look at two important discovery issues. First, the withholding of key documents authored by UT administrators about Lowery. Second, targeted discovery about whether Jay Hartzell used state resources to benefit his son in admission to a UT graduate program.

This Court should reverse the dismissal of Lowery's claims and remand the case for further discovery.

## I.  STANDARD OF REVIEW

De novo review applies to the district court's grant of a Rule 12(b)(6) motion to dismiss and partial summary judgment. *Taylor v. Root Ins. Co.*, 109 F.4th 806, 808 (5th Cir. 2024) (motion to dismiss); *BMC Software, Inc. v. IBM*, 100 F.4th 573, 578 (5th Cir. 2024) (partial summary judgment). The district court's factual findings for attorney-client privilege decisions are reviewed for abuse of discretion, but de novo review applies to the district court's application of the controlling legal standards. *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017) (citations omitted). Discovery orders, including protective orders, are ordinarily reviewed for abuse of discretion, but whether the district court used the correct legal standard in deciding whether to issue a protective order is reviewed de novo. *Id.* at 697-98.

## II.  LOWERY STATED A VIABLE FIRST AMENDMENT RETALIATION CLAIM

The First Amendment prohibits state officials from retaliating against people for their protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). A First Amendment retaliation claim requires proof that a plaintiff suffered an adverse employment action because of his speech. *Maldonado v. Rodriguez*, 932 F.3d 388, 391 (5th Cir. 2019). Once the plaintiff demonstrates that the speech at issue addressed a matter of public concern, the burden shifts to the employer to establish that its interest in promoting the efficiency of the services provided by

its employees outweighs the employee's speech interest. *Id.* "In stating a prima facie case at the motion-to-dismiss stage of a case, there is a rebuttable presumption that no balancing is required to state a claim." *Burnside v. Kaelin*, 773 F.3d 624, 628 (5th Cir. 2014).

In evaluating Lowery's First Amendment retaliation claim, the primary issue before this Court is whether Defendants' threats to cut his stipend and remove his Salem Center affiliation were sufficiently adverse to meet the prima facie standard at the motion-to-dismiss stage. This issue's resolution turns on whether the *Breaux*-completed-adverse-employment-decision test still governs, or whether the more speech-protective *Burlington Northern*[4] standard applies. The district court concluded that *Breaux* precludes Lowery's claim. ROA.1328-1330. Lowery, in turn, urges this Court to join the majority of circuits, which hold that actions that would discourage a reasonable public employee from speaking are sufficiently adverse to state a claim.

A.      Lowery spoke on matters of public importance

A public employee's speech raises a matter of public concern when it can fairly be considered as relating to any political, social, or other community matter. *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)); *Bevill v. Wheeler*, 103 F.4th 363, 375 (5th Cir. 2024). The inquiry turns on the speech's

---

[4] *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006).

content, form, and context. *Lane,* 573 U.S. at 241; *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

Lowery's provocative tweets, articles, and July 2022 podcast appearance unquestionably meet this standard because his comments related to the use of public funds, the ideological direction of the university, and the governance of a public institution.[5] *See, e.g.*, ROA.112, 140-144, 154-157, 171-172, 2711-2712, 2717-2720. Moreover, as one of the few conservative faculty remaining on the Austin campus, he was uniquely situated to report on what was happening on the ground. Indeed, his role as a whistleblower—especially a whistleblower with tenure and academic freedom—made him all the more threatening to UT's administrators, because his speech could reach alumni and elected officials outside the campus bubble and impact the flow of dollars to the university.[6] As the Supreme Court recognized, beyond the

---

[5] In commenting on these public matters, Lowery was also exercising his right to speak, both as an American and as a UT faculty member with academic freedom, "a special concern of the First Amendment." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967); *see also* ROA. 272 (UT rules stating that faculty may speak as citizens and have a duty to contribute to society); Keith E. Whittington, *You Can't Teach That! The Battle Over University Classrooms* 84-85, 88-91 (2024).

[6] While UT has periodically invoked the proposition that Lowery's speech "disrupted" university operations, it has yet to articulate that disruption in a legally meaningful way. Of course, UT administrators and faculty don't like criticism, but that is a feature, not a bug, of First Amendment protected speech. Contrary to UT's assertion, see ROA.224-225, the First Amendment protects calling for a boycott of funding to a

employee's own right to speak, the public has an interest in hearing from employees who are often in the best position to report from the inside. *Lane,* 573 U.S. at 236.

> B. *Breaux's* completed-employment-action standard is no longer good law

> 1. *Burlington Northern implicitly overruled Breaux*

Six years after this Court decided *Breaux,* the Supreme Court rejected the application of the "ultimate employment decisions" test for Title VII employment retaliation claims—holding, instead, that a more relaxed standard applied: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (internal quotation marks omitted). The Supreme Court noted that this Court and the Eighth Circuit had up to that point employed the ultimate-employment-decisions test for retaliation claims, but other circuits had "not so limited the scope" of retaliation claims. *Id.* at 60.

---

public institution. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 571-72, 578 (1968) (teacher who publicly opposed funding increase to public school protected); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911, 914 (1982) ("nonviolent, politically motivated boycott" protected).

Although *Breaux* does not use that terminology, it too limited retaliation claims to completed employment actions. *Breaux,* 205 F.3d at 159. In its holding, the Supreme Court distinguished Title VII's substantive provision—which seeks to prevent injury to employees based on their status—from the purposes of the antiretaliation provision, which "seeks prevent harm to individuals based on what they do, *i.e.*, their conduct." *Burlington Northern,* 548 U.S. at 63. The court further reasoned that providing broad retaliation protection "helps ensure the cooperation" of employees in Title VII enforcement. *Id.* at 67.

This Court has repeatedly acknowledged that *Burlington Northern* has thrown into question *Breaux*'s ongoing validity for First Amendment retaliation claims—describing the issue variously as "open," "not clearly established," and "not yet decided"—but hinting that the *Burlington Northern* standard might apply. *Spears v. McCraw,* No. 20-50406, 2021 U.S. App. LEXIS 23231, at *4-5 (5th Cir. Aug. 5, 2021) ("While it may be true that Spears's PIP satisfies the 'materially adverse' standard, it is an open question in this Court whether that standard applies to claims of retaliation for protected speech"); *Johnson v. Halstead*, 916 F.3d 410, 421 n.5 (5th Cir. 2019) ("not clearly established" if *Burlington* applies); *Gibson v. Kilpatrick*, 734 F.3d 395, 400 n. 4 (5th Cir. 2013), *vacated and remanded on other grounds, Gibson v. Kilpatrick*, 573 U.S. 942 (2014); *DePree v. Saunders*, 588 F.3d 282, 288 (5th Cir. 2009); *see also Leone v. Caddo Par.,* No. 19-

309, 2022 U.S. Dist. LEXIS 25188, at *23-24 (W.D. La. Feb. 10, 2022) (noting that *Breaux* pre-dates *Burlington Northern)*; *Williamson v. St. Tammany Par. Fire Prot. Dist. No. 12*, No. 18-1195, 2018 U.S. Dist. LEXIS 77102, at *13 (E.D. La. May 7, 2018) (collecting cases).

Other district courts in this circuit have gone further, holding that this Court has already implicitly adopted the *Burlington Northern* standard for public-employee First Amendment retaliation claims. *See, e.g., Cox v. Scott Cty. Sch. Dist.,* No. 3:18-CV-677-KHJ-LGI, 2021 U.S. Dist. LEXIS 251706, at *20 n.12 (S.D. Miss. Dec. 21, 2021) ("implicit adoption"); *Sanchez v. Presidio Cty.*, No. P:19-CV-037-DC, 2021 U.S. Dist. LEXIS 118416, at *10-11 (W.D. Tex. June 20, 2021) (collecting cases supporting implied adoption). Indeed, in *Garrett v. Judson Independent School District*, this Court found that a First Amendment plaintiff successfully articulated an adverse employment action even though the only retaliation was a "campaign of unfounded charges of incompetence" that would not qualify as an adverse action under *Breaux.* 299 Fed. Appx. 337, 346 (5th Cir. 2008). The time has arrived for this Court to conclusively resolve this question.

*Burlington Northern* implicitly overruled *Breaux.* While the rule of orderliness often requires this Court to follow a prior Fifth Circuit decision, "[w]hether a Supreme Court decision implicitly overrules a prior Fifth Circuit decision depends on context." *Gahagan v. United States Citizenship & Immigration Servs.*, 911 F.3d 298, 302-03 (5th Cir.

2018). "Sometimes a Supreme Court decision involving one statute implicitly overrules our precedent involving another statute."[7] *Id.* at 302. "The overriding consideration is the similarity of the issues decided." *Id.* at 303. And while "merely illuminating" a prior precedent is insufficient, there is no requirement that the Supreme Court "specifically address the precise question of law at issue." *Bonvillian Marine Serv. v. Pellegrin (In re Bonvillian Marine Serv.)*, 19 F.4th 787, 792 (5th Cir. 2021). "Rather, a latter panel must simply determine that a former panel's decision has fallen unequivocally out of step with some intervening change in the law." *Id.* This includes situations "where an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis." *Id.* (cleaned up).

*Breaux's* focus on completed employment actions is out of step with *Burlington Northern's* focus on broadly protecting employees for their own actions to vindicate their rights—in this case, speaking on matters of public importance. *Compare Breaux,* 205 F.3d at 157

---

[7] *Breaux* expressly interpreted not only the First Amendment but also Section 1983, stating that "the reason for not expanding the list of adverse employment actions is to ensure that § 1983 does not enmesh federal courts in relatively trivial matters." 205 F.3d at 157 (cleaned up). *Burlington Northern* overrules this statutory interpretation about what qualifies as a successful retaliation claim under § 1983. *Breaux's* limitation is also atextual, finding no support in either § 1983 or the First Amendment. *See Hamilton v. Dall. Cty.,* 79 F.4th 494, 497 (5th Cir. 2023) (ending longstanding atextual interpretive incongruity).

("Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands") (citations omitted), *with Burlington Northern,* 548 U.S. at 63 (focusing on employee conduct versus status). Similarly, *Breaux* explicitly acknowledged that its standard would "have the effect of chilling the exercise of free speech." 205 F.3d at 157 (citation omitted). Under *Breaux*, government employees who submit to a threat and stop speaking to avoid being punished *never* have an actionable claim. The government is permitted to silence speech as long as it actually succeeds in censorship. This stands the First Amendment on its head.

*Breaux's* focus on completed employment actions is thus out of step with the Supreme Court's focus on protecting employees for exercising their legal rights. It is similarly out of step with the majority of other circuits that have considered the question.

> 2. *Most circuits apply the Burlington Northern standard to public employees' First Amendment retaliation claims*

The majority of circuits apply some variation of the Title VII test in First Amendment retaliation cases. *See, e.g., Alston v. Spiegel*, 988 F.3d 564, 575 (1st Cir. 2021) (internal quotation marks omitted) ("[T]he pertinent question here is whether [the employee's] action constituted the kind of action that would deter a reasonably hardy individual from exercising his constitutional rights"); *Specht v. City of New York*, 15

F.4th 594, 604 (2d Cir. 2021) (cleaned up) ("An adverse employment action is one that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights"); *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (citing *Burlington Northern*, 548 U.S. at 68) ("To demonstrate that he has suffered an adverse action, a plaintiff must show that the action 'would chill or silence a person of ordinary firmness from future First Amendment activities'"); *Matrisciano v. Randle*, 569 F.3d 723, 730 (7th Cir. 2009) (requiring a plaintiff to show that "he suffered a deprivation likely to deter free speech"); *Couch vs. Bd. of Trs. Of the Mem. Hosp.*, 587 F.3d 1223, 1238 (10th Cir. 2009) (cleaned up) ( appropriate standard is whether "specific actions would deter a reasonable person from exercising his First Amendment rights"); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) ("[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights"); *Coszalter v. City of Salem*, 320 F.3d 968, 970, 976 (9th Cir. 2003) (the "reasonably likely to deter test" means "an adverse employment action is an act that is reasonably likely to deter employees from engaging in constitutionally protected speech");

*Suppan vs. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (using "deter a person of ordinary firmness" standard).[8]

This court is "always chary to create a circuit split . . . including when applying the rule of orderliness." *Gahagan,* 911 F.3d at 304 (cleaned up). It looks to the decisions of "our sister circuits" to assess if the Supreme Court implicitly overruled precedent. *Id.* at 303, 305. This Court should join the majority of circuits in acknowledging that government officials can effectively preclude the exercise of First Amendment using threats that fall short of final employment decisions.

>    3.   *Public employees' free speech rights deserve at least as much protection as statutory rights to non-discrimination*

Section 1983 safeguards constitutional rights by imposing liability on officials who, under color of state law, deprive a person of such rights. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). It is not itself a source of substantive rights, but provides a method for vindicating rights that are conferred by the Bill of Rights or federal law. *Albright v. Oliver*, 510

---

[8] The Supreme Court has left itself some room to titrate exactly how adverse an action must be to amount to retaliation. In *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022), the Court held that an elected official's censure by other elected officials on the same body was insufficient. But the Court went on to note that '[i]t may be, for example, that government officials who reprimand or censure students, employees, or licensees may in some circumstances materially impair First Amendment freedoms." *Id.* at 479-80.

U.S. 266, 271 (1994); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015). In this case, Lowery avails himself of § 1983 to protect his sociopolitical speech, the kind of speech that the Supreme Court has repeatedly recognized "'occupies the highest rung of the hierarchy of First Amendment values' and merits 'special protection.'" *Janus v. AFSCME, Council 31*, 585 U.S. 878, 913-14 (2018) (citing *Snyder,* 562 U.S. at 452) (cleaned up)). While Title VII statutory rights also deserve protection, there is no good reason to privilege those rights over First Amendment rights. Yet continued adherence to the *Breaux* standard does that: creating a two-tiered standard.

C.   A reasonable employee would be dissuaded from speaking by the threat of lost pay and other benefits

This Court has already held in the Title-VII-retaliation context that a "realistic, drastic pay cut threat might deter someone from supporting a discrimination charge in certain circumstances[.]" *Brandon v. Sage Corp.*, 808 F.3d 266, 271 (5th Cir. 2015) (collecting cases); *see also McNeill v. Tyson Fresh Meats, Inc.,* No. 2:23-CV-041-Z, 2023 U.S. Dist. LEXIS 219122, at *14 (N.D. Tex. Dec. 8, 2023) (holding that a pay cut is adverse if it is material). Other circuits have similarly concluded that threats of adverse employment actions can support First Amendment retaliation claims. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 778-79 (9th Cir. 2022) (viable claim against principal who "suggested that disciplinary action could occur if she saw [plaintiff] with his

[MAGA] hat again"); *Kubala v. Smith*, 984 F.3d 1132, 1140 (6th Cir. 2021) (threats alone can constitute adverse action if they would deter a person of ordinary firmness). "The power of a threat lies not in any negative actions eventually taken, but in the apprehension it creates in the recipient of the threat." *Dodge,* 56 F4th at 780 (citations omitted).

Defendants pressured Lowery by threatening his Salem Center affiliation, knowing that it was subject to annual renewal by the deans, and not subject to tenure protection. ROA.107-108, 116, 119, 126-127, 135, 2713, 2724, 2825.[9] In addition to facing the loss of prestige, his supervisory position, and research opportunities that promote his career advancement, Lowery reasonably feared the loss of $20,000 annual stipend: a significant sum. *Id.* And Lowery responded exactly how the Defendants expected he would respond—by self-censoring. ROA.118-121. Only after he began self-censoring was his affiliation renewed. ROA.2825, 2853.

Given *Breaux's* carve out for employer's "threats," it is not surprising that university officials have taken advantage of that gap to intimidate university faculty into silence. As long as it is legal to retaliate against

---

[9] While Defendants dispute that this threat regarding Lowery's Salem Center affiliation was conveyed to Prof. Carvalho with the expectation that he would pass it on to Lowery, Carvalho's declaration supports Lowery's claim. ROA.125-127. Moreover, at the motion-to-dismiss stage, Lowery's factual claims of this sort must be accepted as true. *Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001).

unwanted speech by threatening someone's pay or position, censorial officials will do so, calculating that most employees will keep quiet rather than risk the threats getting carried out. Indeed, that is exactly what happened here. This Court should close that gap and more fully protect First Amendment rights.

III.   LOWERY STATED A VIABLE CHILLED-SPEECH CLAIM

A.   Chilled-speech claims differ from retaliation claims

The Eastern District of Texas recently found that a state university professor stated a viable chilled-speech claim where administrators had investigated and essentially froze his involvement with an academic journal he had created, owing to a controversial article. *Jackson v. Wright*, No. 4:21-CV-00033, 2022 U.S. Dist. LEXIS 8684, at *19-20 (E.D. Tex. Jan. 18, 2022). Specifically, the plaintiff had defended an influential music theorist from charges of racism, by suggesting that one such critic might be anti-Semitic, igniting a public backlash. *Id.* at *4-5.

The court recognized that there "was no unequivocal policy proscribing his intended conduct," but found that the administrator's "implicit policy" of creating a stagnant journal arguably proscribed plaintiff's intended speech. *Id.* at *19-20. The plaintiff's de facto loss of his editorial position and research opportunities sufficed to state a claim. *Id.* Moreover, the plaintiff had stated a First Amendment injury

even in the absence of an explicit threat that disciplinary charges would be brought against him if he continued to express his views. *Id.* at *24-25. "It is the chilling effect on free speech that violates the First Amendment, and it is plain that an implicit threat can chill as forcibly as an explicit threat." *Id.* (quoting *Levin v. Harleston*, 966 F.2d 85, 89-90 (2d Cir. 1992)); *see also Cooksey v. Futrell,* 721 F.3d 226, 236-37 (4th Cir. 2013) (blogger chilled when "told, in effect, that he would remain under the watchful eye of [a] State Board").

Similarly, in *Levin v. Harleston,* the Second Circuit found that a university president's criticisms of a professor's speech and suggestion that it might constitute "conduct unbecoming" sufficed to credibly chill speech, even in the absence of an explicit threat of discipline. 966 F.2d at 89-90. "It is not fatal that Harleston never explicitly stated that disciplinary charges would be brought if Levin continued to voice his views." *Id.*

Thus, in *Jackson,* the district court found that the plaintiff had plausibly alleged claims that survived a Rule 12(b)(6) motion to dismiss "for either retaliation *or* for the unconstitutional stifling of speech—under § 1983." *Jackson,* 2022 U.S. Dist. LEXIS 8684, at *48-49 (emphasis added). While this Court later reviewed that case on appeal from the Rule 12(b)(1) motion, it did not express any concerns about whether Prof. Jackson had stated a viable claim, instead finding that he had standing. *Jackson v. Wright*, 82 F.4th 362, 369 (5th Cir. 2023)

("[H]e has plainly alleged both a continuing and a future injury sufficient to confer standing for him to seek prospective relief").

Other courts evaluate such claims not as chilled-speech claims, but instead as prior restraints on employee speech that are distinct from retaliation claims. "Other times, public employers adopt employee-targeted 'prior restraints' on speech by prohibiting employees from speaking about certain topics in the *future* (on the threat of discipline)." *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 878 (6th Cir. 2024). Like Lowery, such employees "typically request injunctions to prohibit enforcement of a challenged restraint." *Id.* at 878-79; *see also United States v. Nat'l Treasury Emples. Union,* 513 U.S. 454, 480 (1995) (affirming narrow injunction). And while Defendants dispute threatening Lowery's career, they fully admit that they spoke to Carvalho with the intent to affect Lowery's future speech.

### B. UT's officials admitted that their actions were designed to get Lowery to speak differently or not at all

Dean Mills's notes of the August 12 meeting between her, Dean Burris, and Prof. Carvalho memorialize that "Mills asked Carvalho to counsel Lowery regarding making comments that factually inaccurate and disruptive to operations." ROA.3016. Mills's notes also document that she "requires" Salem Center personnel to "cooperate positively or neutrally" with other centers, such as Civitas. ROA.3015. She "related her expectations for . . . reasonable respect for Chain of Command" and

that disagreements should not be aired in public or on Twitter. ROA.3016.

Moreover, when deposed about that meeting, both Mills and Burris admitted that their goal in saying this to Carvalho was to prompt Lowery to stop saying things about UT and its president that they characterized as inaccurate and disruptive.

> Q. Stated another way, your goal in asking Carvalho to counsel Lowery regarding making comments that taxpayer money was stolen by grifters or the president is to be paid to be good at lying to conservative donors and politicians was to get Lowery to stop making those kinds of comments, correct?
>
> A. Yes.

ROA.2977:3-9, 3008:22-3009:11.

Thus, Mills and Burris have both admitted that their goal was to chill Lowery—to get him to speak differently or not at all. While Carvalho refused to "counsel" Lowery, he passed on their message as a warning to his friend, ROA.126-127, who got the message and began self-censoring, ROA.115-116, 118-119. Thus, Mills and Burris obtained exactly the result that they (and likely Hartzell) had sought: Lowery's silence about Hartzell and UT's ideological direction, including his refraining from speaking about those topics in a way they deemed too provocative, "uncivil," or "offensive." *See, e.g.*, ROA.2988, 3015-3016, 3018. While Defendants seek to claim their actions were legal, it cannot be disputed that they (1) actively sought to affect Lowery's future

speech on sociopolitical matters and (2) that they obtained their goal because Lowery stopped speaking, just as they expected he would. If this does not qualify as chilling speech, it is hard to image what would.

### C. The district court should have considered Lowery's judicial-estoppel and law-of-the-case arguments

Whatever may be the exact elements of a chilled-speech claim in this context, it is undisputed that UT originally argued that the test from *Keenan v. Tejeda,* 290 F.3d 252 (5th Cir. 2002) applied,[10] and that the district court initially adopted that test to evaluate Lowery's chilled-speech claim and found he had "sufficiently alleged that Defendants' threats would chill a person of ordinary firmness from publicly criticizing UT Administration and programs." ROA.1331-1332, 3146-3148. Indeed, UT *repeatedly* argued that the *Keenan* test applied, even after bringing its motion to dismiss. ROA.686, 1294, 2405, 3097; *see also* ROA.3148 (n. 3 later describing Defendants' behavior as "baffling").

As a result of the district court's first order denying UT's motion to dismiss Lowery's chilled speech claim dated September 5, 2023 (ROA.1337-1338), the parties proceeded to discovery, which led to

---

[10] The *Keenan* test requires that a plaintiff show: "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." 290 F.3d at 258.

numerous day-long depositions (*see, e.g.,* ROA.2915, 2941, 2966, 2984) and triggered over a half-dozen contested discovery motions, which were referred to the magistrate judge. *See* ROA.11-15 (listing docket entries).

After both sides invested many hours and resources conducting discovery and litigating discovery disputes, UT suddenly reversed course and claimed that *Keenan* was the wrong test for Lowery's chilled-speech claim. ROA.2751-2752. The district court ultimately agreed. ROA.3147-3150. And while the court "chid[ed]" Defendants for citing an incorrect standard, it mistakenly declined "to consider the merits of Plaintiff's arguments concerning the law of the case and judicial estoppel[.]" ROA.3147-3148 (n.3).

> 1. *The law-of-the case doctrine prevented UT from relitigating the Keenan standard*

"The law-of-the-case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case.'" *United States v. Castillo*, 179 F.3d 321, 326 (5th Cir. 1999) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). This doctrine applies both to issues "explicitly decided" and "to those issues decided by necessary implication." *L.L.C. v. Magazine Invs. I L.L.C.*, 79 F.4th 487, 491 (5th Cir. 2023) (internal citation and quotation marks omitted). The doctrine serves to "prevent[] collateral attacks against the court's rulings during the pendency of the lawsuit;"

and "while the law of the case doctrine is a 'rule of convenience and utility,' not an 'inexorable command,' '[a] judge should hesitate to undo his own work.'" *Tex. Entm't Ass'n v. Hegar*, No. 1:17-CV-594-DAE, 2019 U.S. Dist. LEXIS 239481, at *10 (W.D. Tex. Feb. 27, 2019) (quoting *Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983)).

Here the parties relied on the *Keenan* standard after UT argued for that standard and the Court adopted it, allowing discovery to proceed on Lowery's chilled-speech claim. And the *Keenan* standard is as good as any for evaluating the viability of Lowery's chilled-speech claim. Whatever may be the merits of making that test available for other plaintiffs in other cases, it should have remained in place for Lowery's claim in this case—especially because even the Defendants admit that they acted with the specific goal of changing Lowery's speech.[11]

---

[11] This Court could also adopt the "suppression of speech" standard in *Jackson*, 2022 U.S. Dist. LEXIS 8684, at *45, *47 (citations omitted) which requires proof that a plaintiff was "disciplined or fired for speech that is a matter of public concern" and plaintiff's "interest in the speech outweighed the university's interest in regulating the speech." As the *Jackson* decision elsewhere makes clear, "discipline" in this standard is a broad concept that encompasses not only formal discipline but also implicit threats or de facto policies that proscribe plaintiff's intended conduct. *Id.* at *18-*20.

2.	*Judicial estoppel applies where UT urged the district court to adopt a standard and then reversed course*

Judicial estoppel is an equitable doctrine that "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 (5th Cir. 2014) (citation omitted). This doctrine serves to keep parties "from playing fast and loose with the court by changing positions based upon the exigencies of the moment." *Hall v. GE Plastic Pac. PTE, Ltd.*, 327 F.3d 391, 400 (5th Cir. 2003) (citation and internal quotation marks omitted). Three criteria primarily determine if judicial estoppel applies: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261 (5th Cir. 2012) (citation omitted).

Judicial estoppel applies here because UT induced the district court to rely on *Keenan,* which it did. ROA.686, 1331-1332. That UT did not do so inadvertently is shown by the fact that it repeatedly argued that *Keenan* applied—in fact it argued that Lowery didn't meet the *Keenan* test as late as September 19, 2024. ROA.686, 1294, 2405, 3097. Lowery appropriately raised judicial estoppel, but the Court did not analyze that argument. ROA.3148 (n.3). Under these circumstances, it was error for the district court not to even consider the possibility of judicial

estoppel. Moreover, UT's officials are not proceeding pro se. They are represented by one of the largest law firms in Texas—more than mere "chiding" was called for here. Lowery stated a viable pre-enforcement claim to UT's unwritten speech code.

IV.    LOWERY STATED A VIABLE PRE-ENFORCEMENT CLAIM TO UT'S UNWRITTEN SPEECH CODE

    A.    UT has a history of trying to mandate "civility" on campus

Lowery's experiences suggest that UT seeks to accomplish quietly, off-the-books, what it cannot do explicitly: ensure that on-campus political expression comports with the official perspective. The Court may recall that UT previously tried to mandate "civility" and banish "offensive" speech from its campus by incorporating those concepts into several of its written policies affecting speech on campus, an endeavor that also resulted in litigation before this Court.

In *Speech First, Inc. v. Fenves*, this Court held that a student association had standing to challenge UT's campus speech policies. 979 F.3d 319, 338 (5th Cir. 2020). The students wanted to engage in campus political speech that could be roughly characterized as right-coded, including: pro-Israel, pro-colorblindness, pro-life, pro-Second Amendment, pro-border wall, pro-Tea Party, and skeptical of the me-too movement and the Blasey-Ford allegations against then-nominee Brett Kavanaugh. *Id.* at 326. But they were concerned that some of their

proposed speech could violate UT speech policies that prohibited "harassment," "intimidation," "rude[eness] [sic]," "incivility," and "bias," because those terms were ill-defined and failed to cabin officials' discretion. *Id.* at 334.

This Court found the students' intended speech to be "arguably proscribed" by UT's policies even though no sanctions had yet been imposed under the policies and UT officials disclaimed any intention of violating any student's First Amendment Rights. *Id.* at 334-37. The enforcement threat was latent in the policies' existence. *Id.* at 336.

Here, Lowery's intended speech critical of UT and its administration is just as "arguably affected by a constitutional interest" as the plaintiffs who were found to have standing to mount a pre-enforcement challenge in *Speech First*. And that case led to a successful settlement, which required UT to improve its written policies and abolish its speech reporting team. *See Speech First v. Fenves,* Case 1:18-cv-01078-LY, Dkt. 39 at 2-3 (filed 12/20/20), https://perma.cc/4RSU-CFYD (appending settlement agreement). Specifically, UT was required to remove civility clauses from its IT acceptable-use policy and residence hall manuals, and refrain from reinstating an overly broad definition of "verbal harassment." *Id.* Having previously failed to mandate its preferred speech in writing due to litigation, UT's administrators have now resorted to an unwritten civility code, that is selectively enforced

against viewpoints—like Lowery's—that the administration finds "offensive" or otherwise problematic.

> B. An unwritten speech code is both harder to challenge than a written speech code and more subjective

In his First Amended Complaint, Lowery squarely alleged that "UT maintains an unwritten speech code or practice that allows for administrators to counsel or discipline faculty for "uncivil" or "rude" speech. The terms "uncivil" or "rude" are subjective and not defined in writing or limited by objective criteria…" ROA.2736-2737. In so doing, he articulated a classic vagueness and excessive-enforcement challenge to a speech restriction. *See Minn. Voters All. v. Mansky,* 585 U.S. 1, 21-22 (2018). Without "objective, workable standards . . . an election judge's own politics may shape his views on what counts as 'political.'" *Id.; see also Bd. of Airport Comm'rs v. Jews for Jesus,* 482 U.S. 569, 576 (1987) (vague limiting construction would "give LAX officials alone the power to decide in the first instance whether a given activity is airport related"); *Ostrewich v. Tatum*, 72 F.4th 94, 105-06 (5th Cir. 2023) (statute must provide fair notice of what is prohibited); *Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020) (absence of standards invites unbridled discretion); *see also Carroll v. Sears, Roebuck & Co.,* 708 F.2d 183, 192 (5th Cir. 1983) ("presence of unwritten, subjective criteria for promotion" contributed to risk of discrimination). To assess vagueness, a court must consider (1) whether

the restriction provides a person of ordinary intelligence reasonable notice of what is prohibited; and (2) whether the restriction contains explicit standards to avoid arbitrary and discriminatory applications. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008).

But UT's unwritten policy contains no standards at all, inviting administrators to invent post hoc rationales for deeming disfavored speech to "lack civility." *See OSU Student All. v. Ray,* 699 F.3d 1053, 1064-65 (9th Cir. 2012) ("The fact that the 'policy' was not written or otherwise established by practice meant there were no standards by which the officials could be limited. It left them with unbridled discretion").

C. Lowery sufficiently alleged that Mills, Burris, and even Titman acted against him because they deemed some of his public commentary to be "uncivil," "offensive," "unmannerly," "factually inaccurate," or "rude"

Since the district court evaluated Lowery's unwritten speech code claim on a Rule 12(b)(6) motion to dismiss, it should have assumed the veracity of Lowery's factual allegations and drawn all reasonable inferences in his favor. *Vulcan Materials Co.,* 238 F.3d at 387; *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260, 263 (5th Cir. 2014). Lowery's amended complaint sets forth plausible allegations that UT maintains a subjective policy "speech code or practice" that is not defined in writing that "does not sufficiently cabin official discretion"

and invites viewpoint discrimination. ROA.2736. Importantly, Lowery also alleged that leftwing faculty are allowed to use provocative language in their tweets—giving examples, including "racist," "fascist," or "shameful"—without being counseled, asked to be more civil, or placed under police surveillance. ROA.2736-37. Lowery further alleged that UT's unwritten policy invites bad-faith complaints about "safety" and "standards of ethics and respect for faculty" from leftwing faculty who wish to silence dissenters. ROA.2737; *see also* ROA.1904-1905. Moreover, evidence uncovered during the partially completed discovery process supported the existence of UT's unwritten speech code or practice.

For example, in the August 12 meeting, Lowery's speech was a focus of the discussion. ROA.3015-3016. Mills specified that she believed Lowery's opinions about the Liberty Institute were "factually inaccurate," "offensive" or "unmannerly"—in particular his opinions that "taxpayer money is stolen by grifters" (re Liberty funding by legislature) and "the president is paid to be good lying to conservative donors and politicians." ROA. 2833-2834, 2996-2997, 3007, 3016; *see also* ROA.3025-3029 (*College Fix* article quoting Lowery and cited by Mills as problematic speech). Mills also conveyed her requirement that Salem Center personnel "cooperate positively or neutrally" with other UT institutes, which is another way of saying that she expected Lowery to stop criticizing the Civitas Institute or GSLI. ROA.3015-3016. In her

deposition, Mills also expressed that she found two of Lowery's tweets about GSLI to be "offensive." ROA.171-172, 2988, 2997, 3006-3007. Mills also singled out Lowery's tweets requesting that people stop donating to UT and ratified the GSLI personnel's request to place Lowery under police surveillance because of his tone. ROA. 2987, 3007, 3024.

Similarly, in his follow-up meeting with Carvalho two weeks later, Dean Burris repeatedly expressed that Lowery's tweets were "uncivil" in "tone" and "rhetoric" and needed to improve. ROA.2978-2979, 3018. Likewise, when Titman was Lowery's department chair, he indicated that "rude" tweets should not be allowed, referencing Lowery's tweets about GSLI. ROA.2932, 2936. During his deposition, Titman could not provide a workable definition for how to define "rude." ROA.2311 (no written guidelines as to what constitutes a rude opinion).

Although Lowery's amended complaint's allegations about selective enforcement should have sufficed to overcome UT's second motion to dismiss, he also offered concrete examples of provocative tweets from leftwing faculty that UT admitted did not result in either discipline or counseling. ROA.3033-3040. Had Lowery been allowed to depose Hartzell and UT's Rule 30(b)(6) witness as he had requested, see ROA.3053-3055, he could plausibly have developed further probative evidence. Even without it, Lowery had alleged a plausible claim, based on selective enforcement—that is, that his provocative tweets received

undue official attention, while leftwing faculty were essentially left alone. *See, e.g., Gerlich v. Leath,* 861 F.3d 697, 704-07 (8th Cir. 2017) (affirming failure to dismiss First Amendment claim where university administration subjected student group to unique scrutiny after negative publicity); *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1163 (9th Cir. 2022) (reversing dismissal as sufficient allegations that school policy selectively enforced against student's viewpoint, but comparators' viewpoints); *Brooks v. Francis Howell Sch. Dist.*, 599 F. Supp. 3d 795, 804 (E.D. Mo. 2022) (unique scrutiny school board officials placed on dissenting parents groups evidenced viewpoint discrimination); *N.M. Top Organics-Ultra Health, Inc. v. Kennedy,* No. 17-CV-00599-JAP-LF, 2018 U.S. Dist. LEXIS 60361, at *18, *21 (D.N.M. Apr. 10, 2018) (unique scrutiny state fair placed on pro-cannabis exhibitor was evidence of viewpoint discrimination).

### D. Lowery's unwritten speech code claim is like any other pre-enforcement challenge

A plaintiff has met the injury-in-fact requirement for standing under a pre-enforcement theory where (1) he has an intention to engage in a course of conduct arguably affected with a constitutional interest; (2) his intended future conduct is arguably proscribed by the challenged speech restriction; and (3) the threat of future enforcement of the challenged restriction is substantial. *Texas v. Yellen,* 105 F.4th 755, 764-65 (5th Cir. 2024) (citing *Speech First,* 979 F.3d at 330); *Ostrewich,*

72 F.4th at 102 (also citing *Speech First)*; ROA.2729-2731 (detailing Lowery's desire to speak "his mind about political and academic matters, including criticizing the UT administration, DEI policies, the Sustainability [GSLI] Institute and the hijacking of the Liberty Institute"—but for Defendants' actions). Indeed, it is difficult to understand why the student association in *Speech First* had standing to challenge UT's civility policy based on an as-yet unenforced written policy, but Lowery would not have standing to challenge UT's unwritten practice attempting to enforce comparable speech controls on disfavored faculty. *See Speech First,* 979 F.3d at 330 ("The gravamen of Speech First's claims is that its student-members wish to engage in robust debate on timely and controversial political topics from a contrarian point of view. Because their views do not mirror those of many on campus, their speech may be deemed 'harassment,' 'rude,' 'uncivil,' or 'offensive,' as those terms are defined in the University's policies").

Even if one assumes, arguendo, that UT's attempt to use Carvalho to "counsel" Lowery for his unwelcome speech did not quite amount to discipline, it was at least intended to send a message—and that message was received loud and clear. Thus, Lowery faces an even more concrete threat of enforcement than did the students in *Speech First,* because he has already been singled out for publicly criticizing the UT administration. Moreover, because he is challenging an unwritten policy or practice that is essentially subjective, whatever Lowery might

say that irritates a UT administrator can be characterized as "lacking in civility," "offensive," or "rude." Should this Court allow Defendants' behavior to stand, it would provide a roadmap for university administrators who want to censor speech on or about their campuses.

V. THIS COURT SHOULD RE-EXAMINE IN CAMERA SEVERAL WITHHELD DOCUMENTS ABOUT LOWERY

One of Lowery's theories of his case is that Hartzell asked underlings to silence Lowery because the president was offended that Lowery had publicly criticized Hartzell, including opining that Hartzell's job is to be good at lying to Republicans and misdirected the funds allocated for the Liberty Institute. ROA.2710, 2714-2715, 2720. Defendants successfully resisted Lowery's request to take an early deposition of Hartzell. ROA.1106. On April 17, 2023, Defendants Mills and Burris also testified, under oath that they had exchanged *no text messages* with Hartzell about Lowery during the summer of 2022. ROA.1141, 1143, 1147, 1149.

But on December 8, 2023, Defendants finally produced their privilege log, revealing for the first time that Hartzell texted Defendants Mills and Burris about Lowery on August 5, 2022, a mere week before Mills and Burris began pressuring Carlos Carvalho to help silence Lowery. ROA.1423, 1425, 1432-1433, 1436-1437. This text string was a potentially critical communication—the existence of which UT long denied, and the contents which UT refused to describe in more than

superficial detail. UT also withheld "talking points" circulated by Michael Rosen, a non-lawyer, to help UT personnel respond to inquiries generated by Lowery's public comments about the business school's new model syllabus that included a land acknowledgment. ROA.1425-1426, 2833. Lowery moved to compel production of these communications on the basis that they were wrongly withheld business communication or mixed legal and business communications. ROA.1389-1392, 1773-1775.

The magistrate judge reviewed the Hartzell text string and Rosen email in camera and concluded they were properly withheld, but without any analysis. ROA.2524-2525. The district court affirmed that ruling, but without conducting its own in camera review. ROA.2616-2619, 2699-2700. The timing and nature of those communications raises legitimate questions about whether they are wholly privileged, only partly privileged, or not privileged at all. The district court erred in denying Lowery access to this evidence—without even testing defendants' privilege claims in camera.

A.      Hartzell's August 5 text messages to Mills and Burris about Lowery are presumptively unprivileged

UT cannot hide relevant business and public-relations communications from discovery just because a lawyer was part of the communication. Attorney-client privilege "is interpreted narrowly so as to apply only where necessary to achieve its purpose," and any "ambiguities as to whether the elements of a privilege claim have been

47

met are construed against the proponent." *BDO*, 876 F.3d at 695
(cleaned up). "[B]ecause in-house counsel has an increased level of
participation in the day-to-day operations of the corporation,"
communications with in-house counsel are privileged only when "made
for the purpose of giving or obtaining legal advice or services, not
business or technical advice or management decisions." *Stoffels v. SBC
Communs., Inc.*, 263 F.R.D. 406, 411 (W.D. Tex. 2009) (citations
omitted).

Courts must differentiate between in-house counsel's legal and
business work. *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 798
(E.D. La. 2007). If "in-house counsel merely participated in a decision
regarding public relations" by being copied on or replying to a
communication, "the documents do not satisfy the requirements for
attorney-client privilege." *Slocum v. Int'l Paper Co.*, 549 F. Supp. 3d
519, 524-25 (E.D. La. 2021); *see also BDO*, 876 F.3d at 696 ("where
there is a mixed discussion of business and legal advice," the proponent
must establish that the "manifest purpose" was legal). Similarly, public
relations advice is not ordinarily privileged. *See Ictech-Bendeck v. Waste
Connections Bayou, Inc.,* No. 18-7889, 2023 U.S. Dist. LEXIS 92390, at
*44-45 (E.D. La. May 26, 2023); *In re Riddell Concussion Reduction
Litig.*, No. 13-7585 (JBS/JS), 2016 U.S. Dist. LEXIS 168457, at *19, *24-
26 (D.N.J. Dec. 5, 2016).

The Hartzell text and Rosen talking points bear the indicia of business communications. None of them originated with a lawyer, and they present as texts or emails concerning fundraising and public relations sent to a group that included one attorney. Presumptively, these are communications that should be disclosed. Moreover, if they contain discrete legal advice (or requests for legal advice) those portions of the communications can be redacted, and the balance disclosed.

> 1. *UT denied and delayed the disclosure that Jay Hartzell had texted Mills and Burris about Lowery in the summer of 2022*

On April 17, 2023, Deans Mills and Burris each submitted the following DWQ answer:

> **DEPOSITION QUESTION NO. 9.** During the time period from June 30, 2022 through November 1, 2022, did you ever exchange text messages with Jay Hartzell concerning Richard Lowery?
>
> **ANSWER**: No.

ROA.1141, 1143, 1147, 1149.

This answer—provided by two top UT administrators under penalty of perjury—would prove to be factually inaccurate, although UT delayed correction and disclosure for nearly eight more months.

On December 8, 2023, Defendants produced their first privilege log, disclosing the existence of a text communication initiated by Jay Hartzell on August 5, 2022 and sent to defendant Mills, defendant

Burris, Hartzell's deputy Nancy Brazzil, and VP for Legal Affairs
Amanda Cochran-McCall. ROA.1423, 1425.

> ### 2. Hartzell's texts were temporally proximate to the start of the pressure campaign against Lowery

The timing of Hartzell's August 5 text string communicating with
Mills and Burris also underscores its significance. Later that same day,
Burris watched Lowery's podcast interview at home, and a few days
later, Mills and Burris discussed what to do about Lowery. ROA.2721-
2722, 2832, 2969-2973. A few days later, a member of Hartzell's office
forwarded an anonymous complaint against Lowery to the deans for
"follow-up." ROA.1904-1905, 2832. One week after Hartzell's texts, the
two met with Carvalho and attempted to pressure him to "counsel"
Lowery about his speech critical of Hartzell and his handling of the
Liberty Institute matter, and his tweets that asking alumni to stop
donating to UT. ROA.3015-3016. This timing suggests that Hartzell's
texts included a request that Mills and Burris act against Lowery.

> ### 3. A CEO's operational instructions are not privileged just because he includes a lawyer on the text thread

When a corporation "simultaneously sends communications to both
lawyers and non-lawyers, it usually cannot claim that the primary
purpose of the communication was for legal advice because the
communication served both business and legal purposes." *Vioxx*, 501 F.

50

Supp. 2d at 805. Here, Hartzell's text chain was a discussion among top administrators about "media coverage" of the Civitas Institute, which allegedly referred to legal advice provided to Hartzell long before—seemingly before June 11. ROA.1458, 2638-2639, 2644.

Because in-house counsel give operational as well as legal advice, courts in the Fifth Circuit have "increased the burden that must be borne by the proponent" when—as here—communications are with in-house counsel. *Vioxx*, 501 F. Supp. 2d at 797, 799 (citations omitted). UT must make *"a clear showing* that the communication was *primarily* to render legal advice." *Chemtech Royalty Assocs., L.P. v. United States*, No. 05-944-BAJ-DLD, 2010 U.S. Dist. LEXIS 150890, at *22 (M.D. La. Sep. 23, 2010) (emphasis added) (citing 8 Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, *Federal Practice and Procedure* § 2026 (2d Ed. 2007)); The Sedona Conference, *Commentary on Protection of Privileged ESI*, 17 SEDONA CONF. J. 95, 111-12 (2016) (describing this "additional scrutiny").

"[W]hen a corporate executive makes a decision after consulting with an attorney, his decision is not privileged whether it is based on that advice or even mirrors it." *Vioxx*, 501 F. Supp. 2d at 805. Hartzell initiated the text chain here, ROA.2638-2639, and any portions not explicitly seeking or giving legal advice are subject to disclosure. Even

UT does not assert Hartzell sought legal advice in the text.[12] But UT nonetheless claimed that the whole thread should be withheld.

B. Public relations talking points responding to Lowery's speech criticizing the university are not attorney-client privileged

Defendants' first privilege log also listed an August 12, 2022 email and attachment from a university-communications administrator, Mike Rosen, to Hartzell and Mills, that was copied to seven other people. ROA.1425-1426, 2833. Both documents were described as "talking points for syllabus inquiries." *Id*. On August 11, 2022, Lowery had been quoted in a *College Fix* article about UT's new syllabus requirements entitled "Business school professors advised to warn students about possible curriculum-induced trauma," which generated inquiries from donors. ROA.2833-2835.

Rosen's email and attachment appear to consist of widely circulated public relations advice seeking to help UT employees respond to donors angered by the article quoting Lowery. ROA.1398, 1428-1429 (UT emails showing widespread circulation of talking points). If the talking points reflect any specifically identifiable legal advice, it can be redacted, but the talking points themselves should not be withheld. *See Ictech-Bendeck*, 2023 U.S. Dist. LEXIS 92390, at *44-51 (delineating,

---

[12] Mills (not Hartzell) eventually sought legal advice, and she did this only after texts had been exchanged for a while. *See* ROA.1433, 1458, 2638-2639.

after in camera review, which documents must be produced in full and which with redactions). If a corporation "take[s] a document and attachment that are privileged . . . and then subsequently send[s] the same document and attachment to other corporate personnel for non-legal purposes," the "subsequent conveyance" is unprivileged. *Vioxx*, 501 F. Supp. 2d at 809-10.

### C. The district court neglected to conduct its own in camera review of the disputed documents

With only a few documents at issue, in camera review is "a relatively costless and eminently worthwhile method" for evaluating UT's privilege claim. *United States v. Bollinger Shipyards*, Inc., No. 12-920, 2015 U.S. Dist. LEXIS 48175, at *11 (E.D. La. Apr. 13, 2015) (citation omitted).

While the magistrate judge did review the texts and PR emails in camera, the judge did not provide any reasoning explaining why they should be withheld. ROA.2524-2525. The district court, in turn, upheld that order without conducting an in-camera review of its own. ROA.2699-2700. Given that UT concealed these documents for so long, and the timing of authorship in the midst of the operative events in this case, Lowery respectfully requests that this Court take a second look at this handful of documents to confirm whether they should indeed be withheld in their entirety, or produced in part or in total.

VI. LOWERY SHOULD HAVE BEEN ALLOWED TO CONDUCT TARGETED DISCOVERY INTO THE HARTZELL NEPOTISM ALLEGATIONS BECAUSE UT CLAIMED LOWERY MADE INACCURATE STATEMENTS

A. Lowery made credible allegations that President Hartzell used university resources to benefit his son in admission to a competitive graduate program at UT-Austin

In late June 2022, about a month before the pressure campaign against him began, Lowery published an opinion article in the *Washington Times* about racism in university admissions. ROA.140, 143. In that article, Lowery discussed the hypocrisy of university administrators who discriminate against other people's kids while exempting their own children from that treatment. ROA.143. Lowery declared that he had Jay Hartzell in mind as an example when he wrote about this hypocrisy, because his colleague—Carlos Carvalho—had previously told Lowery that Hartzell had used state resources to obtain preferential treatment for his son for admission into a graduate program at UT. ROA.2014-2016. Both Titman and Burris admitted that if Hartzell sought favorable treatment for his son that would have been unethical. ROA.2123-2125, 2220-2221. Lowery attempted to obtain further evidence regarding these allegations in discovery, but UT aggressively moved to prevent his access to that evidence, first quashing a deposition subpoena (ROA.2079-2084) and moving for a protective order on all nepotism-related topics, which was granted, but with superficial reasoning that did not track the requirements of Rule

26(c). ROA.2140-2146, 2527, 2702-2703, 3404-3405. UT never disputed the accuracy of Lowery's nepotism allegations.

> B. UT opened the door to the nepotism allegations because its officials characterized his opinions about Hartzell as "factually inaccurate"

Throughout this litigation, UT leaders, including Dean Mills, have called Lowery's statements "factually inaccurate," "false," "disparaging," and "slanderous." *See, e.g.*, ROA.239, 2976-2977, 3001, 3013. UT argued that "Lowery has no protected right to make statements that intentionally seek to undermine university operations, including its fundraising efforts" because Lowery's "[p]ublic statements *defaming leaders* and sabotaging fundraising efforts impede University operations." ROA.224 (emphasis added). UT also contended that Lowery's views that "President Hartzell is hypocrite and a liar" may "cross the line as . . . [y]ou can't accuse somebody of stealing or being a thief and then expect that to be protected by the First Amendment." ROA.2480 (citation and internal quotation omitted). Hypocrisy is a form of lying.[13]

---

[13] Merriam-Webster, for instance, defines "hypocrisy" as "a feigning to be what one is not or to believe what one does not . . . . *especially*: the false assumption of an appearance of virtue or religion." https://www.merriam-webster.com/dictionary/hypocrisy (last visited January 23, 2025).

Under UT's theory, its administrators were authorized to silence or "counsel" Lowery because his speech was intentionally or recklessly false and disruptive to university operations. *See Pickering,* 391 U.S. at 571-72, 574 (holding that teachers must be able to speak freely about school funding so long as the teacher does not make false statements knowingly or recklessly). By attacking the veracity of Lowery's statements, UT officials opened the door for Lowery to gather evidence that supports his opinions.

It is also plausible that Hartzell was aware of Lowery's *Washington Times* article and, knowing Lowery's close relationship with Carvalho, took action against Lowery to prevent him from revealing the nepotism allegations in order to show that DEI advocates are dishonest hypocrites. *See* ROA.2016. At the very least, Lowery should have been allowed to ask Hartzell, Mills, and Carvalho about the allegations. They are clearly probative of disputed issues in this case, including both the basis of Lowery's opinions and the extent to which those opinions motivated UT officials to attempt to silence Lowery. And if Hartzell did not use state resources to engage in nepotism, then the evidence will show that and he has nothing to fear from such discovery. That UT has invested so much effort in blocking any inquiry into this area is a red flag.

## C. The court's protective order did not meet Rule 26(c)(1)'s good-cause standard

While Rule 26(c)(1) allows a district court to issue a protective order for good cause, "to protect a party . . . from annoyance, embarrassment, oppression, or undue burden or expense," neither the magistrate judge, nor the district court provided any clear analysis as to how UT met this standard regarding the nepotism discovery. ROA.2527, 2702-2703, 3404-3405. Instead, the magistrate judge issued a vague ruling indicating that the nepotism topic was not now discoverable but might become discoverable later. ROA.2527. Although the magistrate claimed discovery into nepotism was unduly "burdensome" "in balance" to its relevance, ROA.3404, he did not explain what this burden was, nor did UT supply any evidence of burden or even argue disproportionality in its briefing. ROA.2141-2144, 2476-2480. No privacy interest protects the right of a public official to cover up abuse of power. The district court simply affirmed the magistrate's ruling and noted that Lowery could always seek to re-litigate that issue. ROA.3404-3405.

The court's failure to articulate the basis under Rule 26(c) for issuing UT's protective order amounts to an abuse of discretion. On remand, Lowery requests that he be allowed to conduct targeted discovery into the allegations that Hartzell engaged in nepotism and used state resources to benefit a member of his family.

Richard Lowery respectfully requests that this Court reverse the district court's rulings on the (1) motion to dismiss; (2) motion for partial summary judgment; (3) order affirming attorney-client privilege in Hartzell's August 5 text messages and the PR-talking points email; and (4) order affirming the protective order preventing discovery into the Hartzell nepotism allegations, and remand this case for further proceedings.

Respectfully submitted,

Dated: January 28, 2025

_s/Endel Kolde_
Endel Kolde
D.C. Bar No. 1782129
Courtney Corbello
Texas Bar No. 24097533
Nathan Ristuccia[14]
Virginia Bar No. 98372
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, D.C. 20036
Tel: (202) 301-1664
Fax: (202) 301-3399
dkolde@ifs.org
ccorbello@ifs.org
nristuccia@ifs.org

_s/Michael E. Lovins_
Michael Lovins
LOVINS | TROSCLAIR
1301 S. Cap. Of Texas
Building A Suite 136
Austin, Texas 78746
Tel: (512) 535-1649
michael@lovinslaw.com

_Attorneys for Richard Lowery_

---

[14] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

CERTIFICATE OF COMPLIANCE

I certify that this brief complies with FED. R. APP. P. 32 and 5TH CIR. R. 32.3, that this brief is set in 14-point Century Schoolbook, a proportionately spaced serif font, and as calculated by Microsoft Word (from a continuously updated Office 365 subscription), considering the appropriate exclusions, contains 12,659 words.

Dated: January 28, 2025

*s/Endel Kolde*