# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 31, 2025

Lyle W. Cayce
Clerk

No. 24-50879

---

RICHARD LOWERY,

*Plaintiff—Appellant,*

*versus*

LILLIAN MILLS, *in her official capacity as Dean of the McCombs School of Business at the University of Texas at Austin*; ETHAN BURRIS, *in his official capacity as Senior Associate Dean for Academic Affairs of the McCombs School of Business at the University of Texas-Austin*; CLEMENS SIALM, *in his official capacity as Finance Department Chair for the McCombs School of Business at the University of Texas-Austin*; JAMES E. DAVIS, *in his official capacity as Interim President of the University of Texas at Austin*,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:23-CV-129

---

Before KING, SMITH, and DOUGLAS, *Circuit Judges.*

JERRY E. SMITH, *Circuit Judge*:

Richard Lowery, a professor at the University of Texas at Austin ("UT"), sued several colleagues in their official capacities under 42 U.S.C. § 1983 for alleged violations of his First Amendment rights. The district court granted motions to dismiss and awarded the defendants partial sum-

mary judgment on Lowery's chilled-speech claim "to the extent that it is cognizable." Lowery appeals those decisions and adverse rulings on two discovery matters. We affirm.

## I. Background

Lowery teaches at the McCombs School of Business and serves as an Associate Director at the Salem Center for Public Policy, an academic institute that is part of the McCombs School. Through social media and written online opinion articles, Lowery has criticized the actions of UT officials and asked elected state-government officials to intervene in the affairs of the school. He alleges that UT officials responded by trying to silence him, including by "threatening his job, pay, institute affiliation, research opportunities, [and] academic freedom." UT also "allowed, or at least did not retract, a UT employee's request that police surveil Lowery's speech."[1] Lowery claims that he self-censored as a form of self-preservation and that that harm to his First Amendment rights is still ongoing.

Using a range of outlets, Lowery has voiced his opinions about critical-race theory, affirmative action, academic freedom, competence-based performance measures, and the future of capitalism. Some of his criticism is personal. He has criticized "self-interested administrators" who disadvantage "people of the same identity profile as their own children" by implementing affirmative action, while at the same time shielding "their children" from that disadvantage. Lowery levied this charge at Jay Hartzell, then President of UT, though Lowery did not identify Hartzell by name.

Lowery also criticized UT officials after the school neglected his

---

[1] "UT" is used as a shorthand for the defendants throughout, even though the University of Texas is not a named defendant. The named defendants are all UT employees sued in their official capacities.

proposal to form "The Liberty Institute," which would have been "dedicated to increasing intellectual diversity and promoting classical liberalism, including support for free markets, ideological neutrality, and ordered liberty." Lowery proposed the creation of that institute with Carlos Carvalho, also a professor at the McCombs School and the Executive Director of the Salem Center (and Lowery's direct supervisor).

To fund the Liberty Institute, Lowery and Carvalho enlisted the support of Hartzell, private donors, and the Texas State Legislature's 2022–23 budget, which allocated $6 million in funding for the Liberty Institute. But after getting recruited to help, Hartzell and other UT officials "hijack[ed]" the project and created a "watered-down 'Civitas Institute.'" Lowery then criticized Hartzell by name in an article in *The Texas Tribune*.

Lowery amplified his criticisms of Hartzell on Twitter (now known as "X"), on a podcast, and in online articles. Lowery's comments often derided UT's "DEI-ideology" and occasionally "tagged" elected officials on Twitter to bring his comments to their attention; one tweet asked why Governor Abbott and Lieutenant Governor Patrick had put Texas's universities on the same "Maoist" path as California's. Lowery's tweets also criticized a different McCombs School institute, the Global Sustainability Leadership Institute ("GSLI"), for "left-wing activism" and called its supporters "shameless and awful."

On July 27, 2022, an anonymous person later identified as Lowery's colleague Kelly Kamm sent an email to the UT compliance office asking the office to review Lowery's appearance on a podcast, to determine whether the episode met UT's standards for ethics and civility. Roughly one month later, Sheridan Titman, the Chair of the Finance Department, was told by Hartzell that Lowery was being "a pain." Around the same time, Titman told Carvalho that they "need[ed] to do something about Richard" and that Hartzell

No. 24-50879

wanted to know if they could "ask [Lowery] to tone it down."

On August 5, 2022, Lowery was quoted in a news article saying that academics like him speaking out against left-wing ideas "will be betrayed by donors, alumni, and politicians." That same day, Hartzell texted Lillian Mills, the Dean of the McCombs School; Ethan Burris, its Senior Associate Dean for Academic Affairs; and a member of UT's legal counsel's office about the media attention Lowery had caused. The following week, Lowery urged his followers on Twitter not to give money to universities such as UT because the universities were advancing left-wing causes.

On August 12, Mills and Burris met with Carvalho for a mostly routine meeting that eventually included discussion of the school's concern about Lowery's speech. Mills and Burris said that Lowery was "crossing the line" and "impeding the operations of the school and the ability to fundraise." Lowery alleges that after Carvalho declined to pressure Lowery to modify his speech, "Dean Mills threatened to remove Carvalho from his post" unless Carvalho got Lowery to behave. Burris and Carvalho met again on October 17, 2022, after which Carvalho "understood that Titman, Mills, and Burris all wanted [Carvalho] to pressure Lowery to temper his political and academic speech, and to convey to him that his relationship with the Salem Center was in danger if he did not do so." Carvalho gave that message to Lowery.

On August 22, 2022, GSLI's Managing Director, Meeta Kothare, emailed Mills a copy of a Lowery tweet criticizing an event held by the institute. That email was forwarded to Titman, who then shared it with Lowery and advised him to take it easier on the GSLI. Lowery eventually set his Twitter account to "private"—meaning only accounts who follow him can see his tweets, significantly limiting his account's reach—after his discussion with Titman about how his tweets were perceived by colleagues. Lowery

No. 24-50879

stopped tweeting altogether in late August 2022.

Meanwhile, another GSLI employee, Madison Gove, emailed UT police officer Joseph Bishop, advising him to look at Lowery's tweets. Kothare and other UT administrators were copied on Gove's email to the UT police, which Lowery characterizes as a request to surveil his speech. Discovery indicates that the UT police opened a "threat mitigation investigation."

On February 8, 2023, Lowery sued Mills, Burris, and Titman in their official capacities. Lowery alleged two counts: a 42 U.S.C. § 1983 action for chilling of his free speech by state actors and a § 1983 action for retaliation for protected speech as a citizen and academic.

On February 17, 2023, Lowery filed a Motion for Preliminary Injunction, seeking to enjoin UT from further chilling Lowery's speech. On March 14, the defendants moved to dismiss the original complaint. While that motion was pending, Burris approved Lowery's reappointment to the Salem Center for the 2023–24 academic year, and Titman approved a raise of over $5,000 to Lowery's salary for his tenured teaching position for the 2023–24 academic year.

 The district court granted the motion to dismiss in part and denied it in part; the court also denied without prejudice Lowery's motion for a preliminary injunction.

The district court first held that Lowery had standing to bring his pre-enforcement First Amendment claims, that the claims were ripe, and that sovereign immunity did not bar Lowery's claims. The court then dismissed without prejudice Lowery's First Amendment retaliation claim because he had not sufficiently alleged an adverse employment action. The court declined to dismiss Lowery's chilled-speech claim.

No. 24-50879

Discovery ensued, which "soon led to numerous conflicts and disputed motions." The first concerns Lowery's motion to compel production of several documents that UT claims are attorney-client privileged; the second concerns a protective order preventing discovery into "allegations that UT President Jay Hartzell used state resources to advantage his son in admission to UT."

On March 28, 2024, Lowery filed an amended complaint, which added Hartzell as an official-capacity defendant, substituted Clemens Siam for Titman as a defendant, added a new unwritten speech code claim, and revised Lowery's pre-existing chilled-speech claim. The amended complaint dropped any explicit reference to the retaliation for protected speech claim. The defendants moved to dismiss the amended claim because "[t]he existence of an unwritten policy is a legal conclusion that needs factual support," and moved for summary judgment on Lowery's chilled-speech claim.

The district court entered its final order and judgment on October 2, 2024, granting UT's motions to dismiss and for partial summary judgment. The court agreed with UT that Lowery's chilled-speech claim was "in essence a First Amendment retaliation claim . . . which requires a plaintiff to demonstrate an adverse employment action." The court then held that because Lowery had not suffered an adverse employment action, he had "not properly alleged a First Amendment violation—for either retaliation or for the unconstitutional stifling of speech under § 1983." The court also found that Lowery had failed to sufficiently allege a facial or as-applied First Amendment challenge to any unwritten speech code employed by UT, granting UT's motion to dismiss that claim as well.

Finally, the district court considered UT's motion for partial summary judgment on Lowery's chilled-speech claim, concluding that even if Lowery "could make out a plausible claim, he would not survive summary

No. 24-50879

judgment." The court noted that even if Lowery received additional information from Hartzell through a deposition, that "would still not produce sufficient evidence to survive summary judgment that an adverse employment action befell Plaintiff." The court thus denied Lowery's motion to defer consideration of UT's motion for partial summary judgment, entered final judgment, and closed the case. Lowery appeals.

## II. Standard of Review

We review *de novo* the grant of a Rule 12(b)(6) motion to dismiss, viewing all facts in the light most favorable to the plaintiff. *Taylor v. Root Ins. Co.*, 109 F.4th 806, 808 (5th Cir. 2024). We review a partial summary judgment *de novo* as well, applying the same legal standards as the district court. *BMC Software, Inc. v. Int'l Bus. Machs. Corp.*, 100 F.4th 573, 578 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1327 (2025). We review discovery orders for abuse of discretion, but we consider *de novo* whether the district court applied the correct legal standard. *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 697–98 (5th Cir. 2017).

## III. Analysis

Lowery raises four issues on appeal: the partial grant of summary judgment for UT for his chilled speech claim, the dismissal of his retaliation claim, the dismissal of his speech code claim, and the denial of two discovery requests. UT asserts that the district court correctly ruled on those matters and avers that Lowery lacks standing to pursue his appeal.

### A. Standing
#### 1. Legal Framework
"Before considering the merits of an appeal, we have an obligation to assure ourselves of litigants' standing under Article III." *Texas v. United States*, 126 F.4th 392, 405 (5th Cir. 2025) (citation modified). Under Article III, a plaintiff "must have suffered an injury in fact—a concrete and immin-

No. 24-50879

ent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

"The party invoking federal jurisdiction bears the burden of establishing standing," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Susan B. Anthony List v. Driehaus* ("*SBA List*"), 573 U.S. 149, 158 (2014) (citation modified). At the motion-to-dismiss stage, Lowery "must allege facts that give rise to a plausible claim of his standing," and in "assessing whether [Lowery] has met this standard, we take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021) (citation modified).

### 2. Application

Lowery asserts that he has standing to challenge "both the UT administrators' self-admitted attempt to chill his speech as well as UT's unwritten speech code." His asserted injury is the "imminent threat of enforcement" of "UT's informal policy of mandating civility when speakers promote disfavored viewpoints or criticize the university president," a policy that Lowery attests chills his speech. To remedy that injury, Lowery requested permanent injunctive relief barring anyone at UT from threatening Lowery for protected speech, counseling him over it, suggesting his speech was "disruptive" or "uncivil" or "rude," or otherwise taking any action against him that would "dissuade a reasonable person in Lowery's position from engaging in protected speech."

#### a. Unwritten Speech Code

Lowery alleges an injury from an unwritten speech code. "One recur-

ring issue in our cases is determining when the threatened enforcement of a law creates an Article III injury." *SBA List*, 573 U.S. at 158. In the First Amendment context, a plaintiff "has suffered an injury in fact if he (1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) his intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (citation modified). When those conditions are met, the chilling of a plaintiff's speech "is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Id.* at 330–31.

### i. Intention to Engage in Protected Conduct

Lowery's complaint avers that he "seeks to vindicate his right of free expression," specifically his right to "engage [his] colleagues and administrators in debate and discussion concerning academic matters, including what should be taught and the school's ideological direction and balance." These concrete plans show a "direct intention to engage in the particular activity that [he] alleges to be arguably regulated[.]" *Id.* at 331 n.7. "Because [Lowery's] intended future conduct concerns political speech, it is certainly 'affected with a constitutional interest.'" *SBA List*, 573 U.S. at 162 (citation omitted); *see also Speech First*, 979 F.3d at 332.

### ii. Arguably Proscribed

"Next, [Lowery] must clearly show a likelihood that [his] constitutionally protected speech is arguably proscribed, or at least arguably regulated, by the University speech policies." *Speech First*, 979 F.3d at 332. Lowery must support each element of standing "with the manner and degree of evidence required at the successive stages of the litigation," *SBA List*, 573 U.S. at 158, and "general factual allegations suffice to establish standing at the motion to dismiss stage," *Dobbin Plantersville Water Supply Corp. v.*

No. 24-50879

*Lake*, 108 F.4th 320, 327 n.4 (5th Cir. 2024) (quotations omitted).

Lowery's unwritten-speech-code claim was dismissed per Federal Rule of Civil Procedure 12(b)(6). For standing purposes, then, Lowery need only allege sufficient facts as to the existence of an unwritten speech code. Lowery supports his claim by alleging that UT responded to his speech by seeking to have him "counseled" and by labeling it "uncivil" and "disruptive," facts he says back up his contention that UT maintains an unwritten speech code that attempts to suppress "uncivil" or "rude" speech. Taken as true, that allegation clearly shows a likelihood that Lowery's "constitutionally protected speech is arguably proscribed, or at least arguably regulated" by UT. *Speech First*, 979 F.3d at 332.

### iii. Substantial Threat of Future Enforcement

"The last element of injury in fact, in this context, is whether it is clearly likely that the future threat of enforcement of the challenged policy is substantial." *Id.* at 334 (citation modified). In *Speech First*, "the existence of [UT's challenged] policies . . . suffice[d] to establish that the threat of future enforcement, against those in a class whose speech is arguably restricted, is likely substantial." *Id.* at 338. Because "such likelihood is all that is necessary to establish the final prong of injury-in-fact for standing to seek a preliminary injunction in this kind of case," the plaintiffs had standing. *Id.*

*Speech First* controls this case. Lowery has alleged the existence of a speech code that, though unwritten, is no less real than the code challenged in *Speech First*. We take Lowery's allegations as true at the motion-to-dismiss stage, meaning we accept the existence of UT's unwritten speech code. That "existence" "is all that is necessary to establish the final prong of injury-in-fact for standing to seek a preliminary injunction in this kind of case." *Id.*

### iv. Causation and Redressability

As in *Speech First*, "[t]he causation and redressability prongs of the

No. 24-50879

standing inquiry are easily satisfied here." *Id.* (citation omitted). "After all, potential enforcement of the challenged policies caused [Lowery's] self-censorship, and the injury could be redressed by enjoining enforcement of [those policies]." *Id.* (citation modified). "Accordingly, [Lowery] has standing to seek a preliminary injunction." *Id.*

b. Chilled Speech and Retaliation

As discussed in the next section, Lowery's chilled-speech and retaliation claims are functionally identical. In both claims, Lowery alleges that statements made by Hartzell and other UT employees to the effect that they had to "do something" about Lowery, in response to Lowery's speech, caused Lowery to self-censor. Because the claims are functionally identical, the same standing analysis applies to each claim.

Although "standing cannot be conferred by a self-inflicted injury," in the context of the First Amendment, "government action that chills protected speech without prohibiting it can give rise to a constitutionally cognizable injury." *Glass v. Paxton*, 900 F.3d 233, 238 (5th Cir. 2018) (quoting *Zimmerman v. City of Austin*, 881 F.3d 378, 389, 391 (5th Cir. 2018)). Such governmental action may therefore "be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 12–13 (1972).

UT asserts that the *Speech First* analysis is "ill-fitted" here because Lowery is not complaining of "statutes, regulations, or rules." UT also notes that because Lowery "is seeking prospective relief and not damages, he must allege a continuing (i.e., ongoing) or "imminent" future injury to establish standing." *Jackson v. Wright*, 82 F.4th 362, 369 (5th Cir. 2023). Finally, UT notes that "Lowery's feelings are not enough to satisfy the exception to [the] general rule against self-inflicted injury for First Amendment chill."

The defendants are right about the legal requirements but wrong

No. 24-50879

about their implications.  Lowery alleges that he "stopped tweeting altogether as of late August 2022" in response to the threats he perceived to his speech.  His self-chilling is thus an ongoing injury, so the only question is whether it is reasonable response to an "objective harm or a threat of specific future harm."  *Laird*, 408 U.S. at 14.

Taking Lowery's allegations as true, as we must at this stage of litigation, Lowery's decision to self-censor is reasonable.  "It is well settled that plaintiffs may establish standing based on the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights," and in "assessing whether an 'objective chill' exists in a particular case, courts must 'look through forms to the substance' of the government's 'informal sanctions.'"  *Speech First, Inc. v. Whitten*, 145 S. Ct. 701, 702 (2025) (mem.) (Thomas, J., dissenting from the denial of certiorari) (citations omitted).  Lowery has alleged several sanctions (both informal and formal) that he would face if he continued to speak his mind on public issues; his pay could be docked, his position at the Salem Center could be revoked, and he could find himself subject to police surveillance.  Those are all consequences that could lead a reasonable individual to self-chill.  Lowery's complaint suffices to establish standing.

Our conclusion in *Speech First* applies equally here: "It is not hard to sustain standing . . . in the highly sensitive area of public regulations governing bedrock political speech."  *Speech First*, 979 F.3d at 331.  Lowery has standing.

## B. Chilled Speech

Lowery brings both his "chilling of free speech" and "retaliation for protected speech" claims under § 1983.  As a close reading of his initial and amended complaints make clear, those claims are materially the same.

Lowery's chilled-speech claim alleges that UT's "threats to reduce

No. 24-50879

Lowery's pay, involuntarily end his affiliation with the Salem Center, reduce his access to research opportunities, inquire about his tweets, label him, request that his speech be placed under police surveillance, or otherwise discipline him are designed to silence Lowery's criticisms or change the content of this speech to make it less critical, disagreeable, or offensive." His amended complaint modifies but largely repeats that language. His chilled-speech claim concludes by asserting that "[b]y chilling Professor Lowery's freedom of speech, Defendants, under color of law, violated and continue to violate Richard Lowery's free speech rights under the First and Fourteenth Amendment to the United States Constitution."

Lowery's retaliation claim similarly asserts that "Defendants retaliated against Lowery for his protected speech by threatening to reduce Lowery's pay, involuntarily end his affiliation with the Salem Center, reduce his access to research opportunities, inquire about his tweets, labeling him, requesting that his speech be placed under police surveillance, or otherwise disciplining him." Those retaliatory steps, Lowery avers, "were such that a reasonable person in Lowery's position would refrain from speaking in the ways at issue in this case," i.e., that Lowery would self-chill.

As pleaded, then, the claims look the same; both counts allege that UT's actions in response to Lowery's speech led Lowery to self-censor. But Lowery asserts they are distinct. Such a distinction matters because an employment retaliation claim requires the plaintiff to demonstrate an adverse employment action, *see Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016), which, as discussed below, poses a challenge for Lowery. A chilled-speech claim, one presumes, would have easier elements to satisfy.

But Lowery does not say what the "exact elements" of a distinct chilled-speech claim are. *Keenan v. Tejada*, the case the district court initially applied, specifically holds that "to establish a First Amendment *retaliation*

No. 24-50879

claim," plaintiffs "must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." 290 F.3d 252, 258 (5th Cir. 2002) (emphasis added). So *Keenan* does not help Lowery distinguish his chilled-speech claim from his retaliation-for speech claim.

Nor does *Jackson v. Wright*, a district court case that similarly wrangled over the difference between retaliation claims and "claims of suppression of speech in violation of the First Amendment in the university context." No. 4:21-cv-00033, 2022 WL 179277, at *17 (E.D. Tex. Jan. 18, 2022), *aff'd on standing grounds*, 82 F.4th 362 (5th Cir. 2023). *Jackson* relied on *Buchanan v. Alexander*, which held that a public-school employee bringing a § 1983 claim for violation of his free speech rights "must show that (1) [he was] disciplined or fired for speech that is a matter of public concern, and (2) [his] interest in the speech outweighed the university's interest in regulating the speech." 919 F.3d 847, 853 (5th Cir. 2019) (citations omitted). Whether the plaintiff was "disciplined or fired" echoes retaliation law, and we have since treated *Buchanan* as a speech-retaliation case. *See Trudeau v. Univ. of N. Tex., By & Through its Bd. of Regents*, 861 F. App'x 604, 609–10 (5th Cir. 2021) (per curiam).

In short, neither *Buchanan* nor any other binding case has recognized any freestanding chilled-speech claim distinct from Lowery's retaliation claim. Lowery's chilled-speech claim, though it proceeded to summary judgment, rises and falls with his retaliation claim.

No. 24-50879

### C. Retaliation
#### 1. Legal Framework

Lowery's retaliation claim hinges on how "adverse" an "adverse employment action" needs to be. He admits that a "First Amendment retaliation claim requires proof that a plaintiff suffered an adverse employment action because of his speech." The question is whether "the *Breaux*-completed-adverse-employment-decision test still governs, or whether the more speech-protective *Burlington Northern* standard applies."

The district court held that *Breaux v. City of Garland* applies. 205 F.3d 150 (5th Cir. 2000). *Breaux* set out four elements a plaintiff must satisfy to establish a retaliation-for-protected-speech claim: (1) He must suffer "an adverse employment decision"; (2) the "speech must involve a matter of public concern"; (3) his "interest in commenting on matters of public concern must outweigh the Defendants' interest in promoting efficiency"; and (4) the plaintiff's "speech must have motivated the Defendants' action." *Id.* at 156 (quoting *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999)). On the first prong, "[a]dverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Id.* at 157 (quoting *Pierce v. Texas Dep't of Crim. Just., Institutional Div.*, 37 F.3d 1146, 1149 (5th Cir. 1994)). In the "education context," "decisions concerning teaching assignments, pay increases, administrative matters, and departmental procedures . . . do not rise to the level of a constitutional deprivation." *Id.* (citation omitted).

Lowery asserts that "the more speech-protective *Burlington Northern* standard applies." Under *Burlington*, plaintiffs bringing claims under Title VII's anti-retaliation provision "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v.*

No. 24-50879

*White*, 548 U.S. 53, 68 (2006) (citation modified).  The Supreme Court explicitly rejected the "adverse employment action" test employed by the Sixth Circuit, which it "defined as a 'materially adverse change in the terms and conditions' of employment."  *Id.* at 60.

The upshot, Lowery contends, is that he need only allege that UT's actions would dissuade a reasonable employee from speaking freely—not that UT took an adverse action against him.  To get around the *Breaux* line of cases, Lowery claims that *Burlington* implicitly overruled *Breaux* and similar Fifth Circuit decisions because, in *Burlington*, the Court "rejected the application of the 'ultimate employment decisions [standard].'"

But the Fifth Circuit adheres to a strong rule of orderliness, which prevents one panel from overturning the decision of another panel unless an intervening Supreme Court decision has "unequivocally overrule[d] [that] prior precedent."  *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (citation omitted).  *Burlington* does not constitute an unequivocal overruling of *Breaux*.  *Burlington*'s holding concerns retaliation claims brought under Title VII, not claims like Lowery's that sound in the First Amendment.  So even if *Burlington* is "illuminating" with respect to retaliation claims, that is not enough to declare that a prior retaliation case has "fallen unequivocally out of step with some intervening change in the law."[2]

The cases that Lowery cites to support his contention that *Burlington* displaced *Breaux* do not do the work that he needs them to.  The first, *Spears v. McCraw*, calls it an "open question" whether the *Burlington* "materially adverse" standard "applies to claims of retaliation for protected speech."

_____

[2] *Bonvillian*, 19 F.4th at 792; *see United States v. Skrmetti*, 145 S. Ct. 1816, 1834 (2025) (similarly concluding that a rule announced in a Title VII case—*see Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)—does not automatically apply to a superficially similar constitutional claim).

No. 24-50879

*Spears v. McCraw*, No. 20-50406, 2021 WL 3439148, at *2 (5th Cir. Aug. 5, 2021) (per curiam) (unpublished). That opinion in turn cites *Johnston v. Halstead*, which collected further cases reiterating that the Fifth Circuit "has not yet decided whether the *Burlington* standard for adverse employment actions also applies to First Amendment retaliation cases." 916 F.3d 410, 422 n.5 (5th Cir. 2019) (quoting *Gibson v. Kilpatrick*, 734 F.3d 395, 401 n.4 (5th Cir. 2013)). In fact, all the cases Lowery cites merely drive home the point that the Fifth Circuit has not treated *Burlington* as controlling in First Amendment retaliation cases. That is far from the "unequivocal overruling" that our "strict and rigidly applied" rule of orderliness requires. *Bonvillian*, 19 F.4th at 792.

The Supreme Court's recent treatment of First Amendment retaliation cases is no more help to Lowery. In *Houston Community College System v. Wilson*, for instance, the Court wrote that under its precedents, "a plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive.'" 595 U.S. 468, 477 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019)). Neither *Houston Community College System* nor *Nieves* suggests the *Burlington* framework applies or even mentions it at all. And though individual justices in *Gonzales v. Trevino* and *NRA v. Vullo* discuss retaliation claims in separate writings, *Burlington* goes unmentioned there too.[3]

Lowery has offered no reason to displace the Fifth Circuit's long-settled, "narrow view of what constitutes an adverse employment action." *Breaux*, 205 F.3d at 157. Thus, this court proceeds with the analysis under

---

[3] *See Gonzalez v. Trevino*, 602 U.S. 653, 662–63 (2024) (Alito, J., concurring); *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 203–04 (2024) (Jackson, J., concurring).

No. 24-50879

*Breaux*.

### 2. Application

As stated above, "[t]o establish a § 1983 claim for employment retaliation related to speech, a plaintiff-employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Anderson*, 845 F.3d at 590.  The core question is whether Lowery can satisfy that first element.

"Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Breaux*, 205 F.3d at 157.  "In the employment context, this court's requirement of an adverse employment action serves the purpose of weeding out minor instances of retaliation." *Keenan*, 290 F.3d at 258 n.4.  "Given the narrow view of what constitutes an adverse employment action, this court has held that the following are not adverse employment actions:" "mere accusations or criticism," "investigations," and "false accusations." *Breaux*, 205 F.3d at 157–58 (collecting cases).

Lowery alleges that UT retaliated against him "by threatening to reduce Lowery's pay, involuntarily end his affiliation with the Salem Center, reduce his access to research opportunities, inquire about his tweets, labeling him, requesting that his speech be placed under police surveillance, [and] otherwise disciplining him."  Given the legal framework discussed above, none of Lowery's allegations is sufficiently adverse.  He was not fired or demoted; his contract was renewed and his pay increased.

The "labeling" and "surveillance" he alleges also run headlong into the precedents identified in *Breaux*.  An "employer's criticism of an employee" does not constitute an actionable adverse employment action, *Har-*

No. 24-50879

*rington v. Harris*, 118 F.3d 359, 366 (5th Cir. 1997), so whatever rude statements were exchanged about Lowery behind his back also do not qualify as adverse employment actions. Similarly, employees who are investigated but not ultimately sanctioned following the investigation also suffer no adverse action. *See Pierce*, 37 F.3d at 1150. So, although Lowery's colleague's reporting him to the police caused Lowery discomfort, the action does "not amount to adverse employment decisions because no adverse result occurred." *Id.*

This court has long "declined to expand the list of actionable actions, noting that some things are not actionable even though they have the effect of chilling the exercise of free speech." *Breaux*, 205 F.3d at 157 (citations omitted). Lowery has not shown why his case should be an exception. Because Lowery has not pleaded that he suffered an adverse employment action, his retaliation claim cannot succeed.[4]

### D. Speech Code

Lowery asserted a facial and as-applied challenge to UT's alleged "unwritten speech code." The district court dismissed both challenges.

### 1. Legal Framework

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Conclusory allegations, naked assertions, and "a formulaic recitation of a cause of action's elements will not do."

---

[4] Lowery's law-of-the-case and judicial estoppel arguments also fail. The former cannot succeed, as the district court did not "finally decide" whether *Keenan* applied. *See United States v. U.S. Smelting Ref. & Mining Co.*, 339 U.S. 186, 198 (1950). Similarly, his judicial estoppel arguments fail, as the district court did not abuse its discretion in allowing UT to amend its position in a manner that did not create an improper legal advantage. *See New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001).

No. 24-50879

*Twombly*, 550 U.S. at 555. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *id.* at 570, and a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Lowery alleges that after UT abandoned the written speech code challenged in *Speech First*,[5] it adopted a materially identical unwritten one that chills Lowery's speech because of its vague proscriptions (e.g., discouraging "rude" and "uncivil" speech) and its selective enforcement. Lowery challenges this alleged speech code on both as-applied and overbreadth grounds. "Although litigants are permitted to raise both as-applied and overbreadth challenges in First Amendment cases, the lawfulness of the particular application of the law should ordinarily be decided first." *Serafine v. Branaman*, 810 F.3d 354, 362 (5th Cir. 2016) (quotation omitted). Following *Serafine*, we consider Lowery's as-applied challenge first and then his facial challenge. 810 F.3d at 362.

### 2. As-applied Challenge

Although individuals do not relinquish their First Amendment rights by accepting public employment, *see Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), a public employer "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large," *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465 (1995). In evaluating the validity of a restraint on government employee speech, courts must "arrive at a balance between the interests of

---

[5] The *Speech First* litigation settled, which required UT to revise its written policies and abolish its speech reporting team.

No. 24-50879

the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

*Pickering* balancing generally arises in the context of a terminated employee's suing for alleged retaliation.[6]  Because, as discussed above, Lowery did not suffer an adverse employment action, the framework for evaluating his speech-code claim is uncertain.  Perhaps for that reason, the district court found that, "to the extent that Plaintiff's claim is essentially a [F]irst [A]mendment retaliation claim, it fails for lack of any adverse action."  This circuit's caselaw supports that conclusion.[7]

Lowery does not propose an alternative framework by which to evaluate his as-applied challenge.  He gestures toward what could be called a reciprocity requirement, positing that it "is inappropriate for UT administrators to pick-and-choose which faculty members' political viewpoints get to use provocative language."  He thus contends that it is improper that he was "counseled" and "placed under surveillance" for his political beliefs, but "leftwing faculty" who use provocative language in their tweets such as "racist," "fascist," or "shameful" are not asked to be more civil or placed under police surveillance.

---

[6] *See, e.g.*, *Pickering*, 391 U.S. 563; *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979); *Connick v. Myers*, 461 U.S. 138 (1983); *Rankin v. McPherson*, 483 U.S. 378 (1987); *City of San Diego, Cal. v. Roe*, 543 U.S. 77 (2004); *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

[7] *See Buchanan*, 919 F.3d at 853 ("Public university professors are public employees.  To establish a § 1983 claim for violation of the First Amendment right to free speech, they must show that (1) they were disciplined or fired for speech that is a matter of public concern, and (2) their interest in the speech outweighed the university's interest in regulating the speech.").

No. 24-50879

Even accepting those allegations as true, it is not clear on what ground we could reverse. The First Amendment generally prohibits public employers from disciplining their employees for their political beliefs, but it does not require university administrators to be equally charitable to all their colleagues. Thus, even if Mills said that she thought "Lowery's opinions about the Liberty Institute were 'factually inaccurate,' 'offensive' or 'unmannerly'" but did not similarly disparage the views of left-wing colleagues, it is not evident what § 1983 has to say about that. That sort of internecine strife is likely "too trivial or minor to be actionable as a violation of the First Amendment" and exemplifies "the purpose" of "this court's requirement of an adverse employment action," which is "weeding out minor instances of retaliation." *Keenan*, 290 F.3d at 258 & n.4 (citing *Colson v. Grohman*, 174 F.3d 498, 510, 514 (5th Cir. 1999)).[8]

For these reasons, Lowery's as-applied challenge fails.

### 3. Overbreadth Challenge

First Amendment overbreadth challenges "are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the [policy] from chilling the First Amendment rights of other parties not before the Court." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984). Although a facial challenge ordinarily requires a plaintiff to establish "that no set of circumstances exists under which [the challenged law] would be valid," in the First Amendment context, the Supreme Court recognizes "a second type of facial challenge" whereby a law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional, judged

---

[8] Further, as UT notes, allowing Lowery's as-applied speech code claim to proceed on his pleadings would "permit any plaintiff to transform an unsuccessful retaliation claim into a claim that the defendant maintains an 'unwritten speech code,' applicable only to him, with a simple sentence."

No. 24-50879

in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472–73 (2010) (citations omitted).

Lowery asserts that UT did not actually retire the speech code that was successfully challenged in *Speech First*. In Lowery's view, UT still enforces it in an unwritten form. Accepting, *arguendo*, that allegation as true, the question becomes whether the code "will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Lowery can succeed on his pre-enforcement overbreadth challenge only "if a substantial number of its applications are unconstitutional." *Serafine*, 810 F.3d at 363; *Stevens*, 559 U.S. at 472–73.

In an ordinary pre-enforcement challenge to a policy that arguably circumscribes protected speech, our first step "is to construe the challenged statute." *Serafine*, 810 F.3d at 365. That task is obviously harder where the challenged policy is not written. Lowery alleges that the code allows UT to "counsel or discipline faculty for 'uncivil' or 'rude' speech" and forbids faculty members from "advocating that donors stop donating to UT." But even if that is so, UT's regulation would be "constitutionally overbroad" only if it "prohibits a substantial amount" of protected speech and "is not susceptible to a limiting construction that avoids constitutional problems." *McClelland*, 63 F.4th at 1012.

In the absence of a written code or an adverse employment action, it is difficult to know whether the alleged code prohibits a substantial amount of protected speech or whether it can be narrowly construed. But certain principles can guide our analysis. First is the principle that First Amendment facial challenges should be granted "sparingly and only as a last resort." *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). Next is that, of "all fields

that the federal courts should hesitate to invade and take over, education and faculty appointments at the university level are probably the least suited for federal court supervision." *Dorsett v. Bd. of Trs. for State Colls. & Univs.*, 940 F.2d 121, 124 (5th Cir. 1991) (citation modified). Finally, a plaintiff's claim must contain sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Taking those principles together, it is apparent that Lowery's complaint does not establish that he can prevail on the "sparingly" used overbreadth theory. Lowery's complaint alleges little more "than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). As far as factual allegations go, Lowery's brief notes only that Mills discussed with others her views about Lowery's speech, that Mills conveyed her requirement that Salem Center personnel "cooperate positively or neutrally" with other UT institutes, and that Burris told Carvalho that he did not like the tone of Lowery's tweets. None of those allegations supports the existence of an unwritten speech code, and indeed, the defendants "never claimed their alleged actions were the enforcement of policy or that a policy exists."

Further, even assuming the existence of a speech code, to prevail on his overbreadth challenge, Lowery would still need to establish that a "substantial number of its applications are unconstitutional." *Serafine*, 810 F.3d at 363. That would be the case only if applications of the code frequently failed *Pickering*. That test involves "a delicate balancing of the competing interests surrounding [an employee's] speech and its consequences," which considers "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528 (2022) (citation modified).

No. 24-50879

Whether a "substantial" amount of speech code applications would fail *Pickering* is at this point entirely speculative, further weighing against Lowery's overbreadth claim. "In other words, [Lowery] asks us to throw out too much of the good based on a speculative shot at the bad." *United States v. Hansen*, 599 U.S. 762, 784–85 (2023). That "is not the stuff of overbreadth." *Id.*

This court recently abjured the responsibility of becoming the "Federal Library Police," recognizing that the often-quotidian concerns of librarians about which books to include on their shelves is not the province of federal judges.[9] We must similarly abjure the opportunity to become the Federal Faculty Lounge Police. If UT fires Lowery for his speech or invokes a speech code to enforce ideological conformity, a § 1983 action would be appropriate. But Lowery's complaint offers only general insinuations that the grumblings of the defendants about a troublesome colleague amount to viewpoint suppression. Allowing so conclusory a complaint to proceed would invite federal courts into an area we have already declared particularly poorly "suited for federal court supervision." *Dorsett*, 940 F.2d at 124.

## E. Discovery

Lowery challenges two discovery rulings: (1) whether certain communications among UT administrators should be protected by attorney-client privilege and (2) whether Lowery should be permitted targeted discovery regarding nepotism allegations against President Hartzell.

We review a denial of a discovery request for abuse of discretion. *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 278 (5th Cir. 2010). A district court's

---

[9] *Little v. Llano Cnty.*, 103 F.4th 1140, 1160 (5th Cir. 2024) (Duncan, J., dissenting), *on reh'g en banc*, 138 F.4th 834 (5th Cir. 2025) (en banc) (adopting view of the panel dissent), *petition for cert. filed* (Sept. 9, 2025) (No. 25-284).

No. 24-50879

decision should be reversed only in "unusual and exceptional" cases, *O'Malley v. U.S. Fid. & Guar. Co.*, 776 F.2d 494, 499 (5th Cir. 1985) (internal quotation marks omitted), such as where the decision is "arbitrary or clearly unreasonable," *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 817 (5th Cir. 2004) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 876 (5th Cir. 2000)). Even if a district court abuses its discretion, the reviewing court will not reverse the ruling unless it substantially affects the rights of (*i.e.*, prejudices) the appellant. *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 481 (5th Cir. 2018). "The appellant bears the burden of proving abuse of discretion and prejudice." *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258 (5th Cir. 2011)

### 1. The Privilege Dispute

Lowery challenges the withholding of two categories of documents: (1) August 5, 2022, text messages from President Hartzell to Deans Mills and Burris about Lowery and (2) August 12, 2022, "talking points" from communications official Mike Rosen regarding responses to Lowery's public criticism. The magistrate judge reviewed the Hartzell text string and Rosen email *in camera* and concluded that they were properly withheld, and the district court sustained that ruling without conducting its own *in camera* review. Lowery asserts that both judges erred.

Lowery does not show that the district court abused its discretion. It properly reviewed the magistrate judge's order under the clearly erroneous standard.[10] Under that standard, it is difficult to see how the district court could have done anything but affirm the ruling.

---

[10] 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); *see Castillo v. Frank*, 70 F.3d 382, 385 (5th Cir. 1995) (stating that 28 U.S.C. § 636 "specifically requires the district court to apply a 'clearly erroneous' standard when reviewing a magistrate judge's ruling on a non-dispositive, pretrial motion such as a discovery motion").

No. 24-50879

Lowery's argument relies mainly on the proposition that courts "must differentiate between in-house counsel's legal and business work." But that goes to whether the documents were in fact privileged, not whether the district court abused its discretion in accepting the magistrate judge's finding that they were. Because Lowery "provides no specific argument and cites no authority to support its assertion that the district court abused its discretion," and because "the district court's decision was neither arbitrary nor clearly unreasonable," we affirm.[11]

### 2. Protective Order

Lowery posits that the district court erred by not allowing him to seek discovery into his allegations of nepotism against Hartzell. That claim, though not directly related to Lowery's complaint, is arguably relevant because Lowery believes that UT's retaliation against him was in part motivated by a *Washington Times* article he authored decrying Hartzell's hypocrisy. Specifically, Lowery "discussed the hypocrisy of university administrators who discriminate against other people's kids [through affirmative action] while exempting their own children from that treatment," ostensibly through nepotism. UT successfully obtained a protective order blocking all nepotism-related discovery.

Even if the district and magistrate judges abused their discretion by blocking discovery into Hartzell's son's admission into UT—and Lowery's brief does not offer compelling reasons to think that they did—Lowery was not prejudiced by that decision. Exposing Hartzell for securing special treat-

---

[11] *SiteLock, L.L.C. v. GoDaddy.com, L.L.C.*, No. 22-11109, 2023 WL 4015117 (5th Cir. June 13, 2023) (per curiam) (unpublished); *see also United States v. Hamilton*, 991 F.2d 797, at *5 (6th Cir. 1993) (per curiam) (unpublished) ("Because the magistrate judge, through an in camera review . . . found that [testimony] would not be helpful, the district court was not required to conduct a second in camera review of [the testimony].").

No. 24-50879

ment for his son would do nothing to vindicate Lowery's self-chill or unwritten-speech-code claims. And even if the discovery does provide reason to think that Hartzell was predisposed to retaliate against Lowery, Lowery still could not show that he suffered an adverse action. Thus, Lowery's challenge to the protective order fails, as the order did not affect his substantial rights. *See N. Cypress*, 898 F.3d at 481.

\* \* \* \* \*

Lowery has standing to press his claims, but those claims cannot succeed. His retaliation claim fails because he did not suffer an adverse employment action. His self-chill claim fails because it is a re-packaged retaliation claim. His speech code claim fails because his complaint does not sufficiently allege facts from which to infer the existence of an unconstitutional policy. And his discovery disputes cannot overcome the abuse-of-discretion standard or Lowery's requirement to show prejudice. The judgment is accordingly AFFIRMED.